J-A18035-16

2016 PA Super 200

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JACK T. LAMBERT, | |
| Appellant | No. 2209 MDA 2015 |

Appeal from the Judgment of Sentence October 30, 2015
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-MD-0001849-2015

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED SEPTEMBER 07, 2016**

Jack T. Lambert ("Appellant") appeals from the judgment of sentence entered by the Court of Common Pleas of Centre County, which found him in indirect criminal contempt of a prior Protection From Abuse ("PFA") order[1] and sentenced him to 30 days' incarceration and a consecutive period of 5 months' probation.  Appellant contends that the Commonwealth failed to prove he intended to violate the PFA order and asserts that the PFA order's restriction against posting any remarks or images involving the victim on social media violated his constitutional right to free speech.  We affirm.

_____

[1] 23 Pa.C.S. § 6114.

*Former Justice specially assigned to the Superior Court.

In early October of 2015, the plaintiff ("Plaintiff") ended her one and one-half year intimate relationship with Appellant because of what she termed "his mental abuse and everything he has absolutely put me through, especially in the last six months." N.T. 10/30/15 at 4. She filed an emergency PFA petition on October 13, 2015, and, on October 26, 2015, obtained a final PFA order against Appellant. N.T. at 5. The order directed that, for the ensuing three years, Appellant was prohibited from having any contact with Plaintiff, either directly or indirectly, at any location. Final Order, filed 10/26/15, at 2.; C.R. #3. Moreover, the order directed that "**[Appellant] may not post any remark(s) and/or images regarding Plaintiff, on any social network(s), including, but [not] limited to, Facebook, Myspace, Twitter, or any other electronic networks.**" *Id.* (emphasis in original).

The day following entry of the final PFA order, Appellant authored a series of posts on Facebook alluding to a nameless, former paramour, his disapproval of how she ended their relationship, and the emotions he was experiencing because of the unfair treatment he believed he received from both her and the justice system. The following posts represent a sample of the Facebook comments at issue:

- I've lost my love and trust in people. I don't think I'll ever trust again. I gave her my full trust just for her to use it against me and then has somebody else within days. She never loved me but I loved her and still do. But things are different now. So, it is time to let go of her and let her be happy and hopefully she someday realizes that she needs

help and turn back into the wonderful woman I love. She has three years now without me taking care of her and doing everything for her. So, maybe she will finally see things differently and see I'm willing to wait for her. I have to. She's my soulmate.

- I'm just so fucking depressed. I am so sorry, Facebook, but I lost my best friend, my love, my soul. My heart is crushed. God only knows what I will do next. I am so lost right now. God, help me through this. Please give me my love back. I have been trying to do everything right but I screw up sometimes. I can't deal with the pain.

- Wondering how you can go from lovin [sic] someone who takes excellent care of you to absolutely hating them people have arguments but that doesn't mean you stop loving them unless you never really loved them at all and was just using them.

- How can someone say they love someone and within a few days be with someone else is that a slut or what[?]

- [Appellant updated his profile picture, which depicts his nautical star tattoo, one of a set of matching tattoos that both he and Plaintiff got on their lower legs while they were a couple.]

- Justice system sucks and too many women abuse it.

Commonwealth's Exhibit 1, N.T. at 7-13.

Plaintiff contacted authorities and asserted that Appellant's Facebook activity represented a violation of the PFA order filed one day earlier. Bellefonte Police investigated her claim and forwarded Appellant's posts to the Centre County District Attorney's Office, which took the view that Appellant had violated the PFA order's prohibition against referencing the Plaintiff on social media. Accordingly, the DA's office filed a criminal

complaint charging Appellant with indirect criminal contempt of the court's PFA order.

At the hearing of October 30, 2015, Plaintiff described her fearful reaction to Appellant's posts, which were entered into evidence during her testimony. Though the posts never identify her by name, Plaintiff was certain she was the subject of Appellant's commentary. The use of personal pet names such as "soulmate," "love of his life," and "Sunshine,"[2] displaying the image of their shared tattoo, discussing relationship troubles, criticizing the justice system and how women abuse it, and referencing the "three years" she would have "without [him] taking care of her" all pertained to her and the three-year duration of the PFA order, Plaintiff testified. N.T. at 7, 9-10, 11-13, 16.

As to Appellant's comment "God only knows what I will do next," Plaintiff testified as follows:

> Q: When you read things like this saying, ["]God only knows what I will do next,["] how do you feel?
>
> A: What he says is true. God only knows what he will do next.
>
> Q: Does that concern you at all?
>
> A: Most definitely.

---

[2] Plaintiff provided unrebutted testimony that the post containing Appellant's use of the pet name "Sunshine" is not among the October 27, 2015, series of posts appearing in the Commonwealth's Exhibit 1, but appears, instead, in a subsequent post made by Appellant. N.T. at 16.

Q: Why? Why does that worry you?

A: That worries me because what he – what has not been directed to the Court.

Q: What do you mean by that?

A: There are things that Jack has wanted to do that I have stopped him to do [sic].

Q: Can you tell us what you are talking about? The Court doesn't have that information. So, you're referencing why you're scared. You can tell the Court why you're scared when you read posts like this. Because you know what he's referring to?

A: Yes, I do.

Q: Tell us.

A: But if I do that and he gets out, I'm afraid of what he will do next.

Q: Do you have concerns for your own physical safety?

A: Absolutely.

Q: Do you have concerns for the safety of others?

A: Absolutely.

***

Q: [After establishing that plaintiff saved all Appellant's posts to her clipboard before he decided to remove them] So, at some point last night, the posts that we just talked about were removed?

A: Correct, except for the one that's there today that says this war is not over.

Q: When was that posted?

A:     I believe last night or Wednesday.  I'm sorry.  I believe Wednesday.  I could be wrong on the date.

Q:     Was it at some point after these posts?

A:     Yes.

Q:     That's something that you actually viewed?

A:     Yes.

Q:     Were you concerned about that?

A:     Yes.

Q:     Why?

A:     I don't know what Jack is capable of.  Jack has been in and out of many mental hospitals throughout our relationship.  I have personally had to 302 Jack.  He has involuntary (sic) [in original] put himself in mental institutions many times for homicidal thoughts – is one of the main things that really scare[s] me.

N.T. 12-14.

On cross-examination, Plaintiff testified that she accessed Appellant's comments, all of which were contained in "public posts," through her own Facebook account.  N.T. at 15.  She said she often checked his Facebook page for her own safety because he "is known to post all of his feelings on his Facebook, and it would give me enough time to react."  N.T. at 15-16.

Arresting officer, Sergeant Jason Brower of the Bellefonte Borough Police Department, testified that Appellant admitted "some of the posts were about her [Plaintiff] and some were about somebody else…."  N.T. at 19.  Appellant, himself, testified similarly, although he insisted that most of his

posts were about somebody else—a former love, with only the post referencing "three years" pertaining to Plaintiff. N.T. at 22.

On cross-examination, Appellant admitted posting something regarding Plaintiff despite knowing that the court's order specifically prohibited him from doing so. N.T. at 25-26. On re-direct, Appellant said he did not intend to violate the PFA order, testifying "I didn't think it was exactly about her because I didn't say her name or nothing." N.T. at 23. Appellant also claimed he thought he had blocked Plaintiff's access to his Facebook postings, and he does "not know how it became unblocked." N.T. at 24-25.

At the conclusion of the hearing, the court convicted Appellant of Indirect Criminal Contempt for violation of the PFA order and sentenced him as noted, *supra*. This timely appeal followed.

Appellant presents two questions for our review:

1. Did the Trial Court abuse its discretion by finding [Appellant] in Indirect Criminal Contempt of his Protection From Abuse Order where there was no wrongful intent and [Appellant's] social media posts did not threaten, stalk, harass, or contact [Plaintiff]?

2. Is the restriction in [the] Trial Court's Protection From Abuse Order from posting any remarks and/or images "regarding" [Plaintiff] on any social media networks an unconstitutional violation of free speech as protected by the Constitution of the Commonwealth and the Constitution of the United States?

Appellant's brief at 6.

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1262 (Pa.Super. 2008).[3] Where a PFA order is involved, "an [indirect criminal contempt] charge is designed to seek punishment for violation of the protective order." *Commonwealth v. Jackson*, 10 A.3d 341, 346 (Pa.Super. 2010) (citation omitted). A charge of indirect criminal contempt consists of a claim that a violation of an order or decree of court occurred outside the presence of the court. *Commonwealth v. Baker*, 722

_____

[3] The Act defines abuse, in pertinent part, as:

> **"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or person who share biological parenthood.
>
> ***
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> ***
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecution commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

A.2d 718, 720 (Pa.Super. 1998) (*en banc*). To establish indirect criminal contempt, the Commonwealth must prove: 1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent. ***Commonwealth v. Walsh***, 36 A.3d 613, 619 (Pa.Super. 2012).

> [W]hen reviewing a contempt conviction, much reliance is given to the discretion of the trial judge. Accordingly, [the appellate court is] confined to a determination of whether the facts support the trial court decision. ***Williams v. Williams***, [ ] 681 A.2d 181, 183 (Pa.Super. 1996)[.] We will reverse a trial court's determination only when there has been a plain abuse of discretion.

***Commonwealth v. Kolansky***, 800 A.2d 937, 939 (Pa.Super. 2002) (some citations omitted).

In his first issue, Appellant contends the Commonwealth failed to prove he acted with the intent to contact Plaintiff or violate the PFA order in any way. Specifically, Appellant posits:

> The posts at issue "did not mention [Plaintiff's] name, were on [Appellant's] personal profile page, and in no way alerted [Plaintiff] to their presence. . . .There is no indication that any other person besides [Plaintiff] would even know who [sic] [Appellant] was speaking about, nor that [Plaintiff] would have ever known about the posts had she not purposefully sought them out.

Appellant's brief at 16.

Appellant admitted, however, that he posted comments and an image "regarding Plaintiff" on an electronic network despite knowing the PFA order prohibited him from doing so. Though Appellant refrained from using Appellant's proper name, the insinuation that Plaintiff and the recent PFA order at issue were the subjects of Appellant's Facebook activity was obvious and unmistakable. The temporal proximity between the hearing and posts, along with the various negative references to both a recently estranged paramour who would realize her mistake over the next three years and a judicial system which she allegedly abused to his detriment,[4] lead to the inescapable conclusion that Appellant was referring to Plaintiff.

Under such circumstances, and guided by the overarching purpose of the PFA to prevent abuse, we find ample evidentiary support for the trial court's determination that Appellant possessed the wrongful intent to violate the PFA. ***Kolansky***, ***supra***. ***See Commonwealth v. Brumbaugh***, 932 A.2d 108, 111 (Pa.Super. 2007) ("[W]rongful intent can be imputed by virtue of the substantial certainty that [one's actions will be]. . .in violation

---

[4] Our conclusion in this respect, moreover, leads us to reject as unfounded Appellant's related argument that the PFA order was not definite, clear, or specific where it proscribed electronic postings "regarding" Plaintiff. On this point, Appellant argues "[t]he imprecise wording of the Order's social media restriction was not clear or specific enough to indicate Appellant would be in violation for posting about himself, his feelings, or his tattoos." Appellant's brief at 20. As seen in the excerpts and testimony, *supra*, the record belies his claim of being the sole subject of his public postings.

of the PFA Order."); **Commonwealth v. Haigh**, 874 A.2d 1174 (Pa.Super. 2005) (holding judges should use common sense and consider context and surrounding factors in making determination as to whether violation of a PFA is truly intentional). Accordingly, we reject Appellant's argument that no wrongful intent attended his Facebook activity on the day following entry of the PFA order against him.

In his remaining issue, Appellant contends that the PFA order in question violates his free speech rights contained in the First Amendment of the United States Constitution and Article 1, Section 7 of the Pennsylvania Constitution. He advances a four-pronged attack on the court's order in making this claim, asserting it: (1) represents an unlawful content-based restriction on protected speech; (2) imposes an impermissible blanket prohibition on any remark regarding Plaintiff without demonstrating how it advances a compelling governmental interest; (3) represents an impermissible prior restraint on protected speech; and (4) imposes an unconstitutionally vague and overbroad restriction on social media usage.

The Commonwealth responds that the PFA Order is not content-based but is, instead, contact-based, requiring Appellant to refrain from referring to Plaintiff with words or images appearing in publicly accessible electronic networks. As long as the restriction is "justified without reference to the content of the regulated speech," "is narrowly tailored to serve a significant or substantial governmental interest," and leaves "open ample alternative channels of communication[,]" the Commonwealth maintains, the restriction

is reasonable. Appellee's brief at 24 (citing *Golden Triangle News, Inc. v. Corbett*, 689 A.2d 974 (Cmwlth. Ct. 1997)).

We first set forth our scope and standard of review, noting that the United States Supreme Court has stated that in reviewing First Amendment cases, appellate court must conduct a review of the entire record. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991); *In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d 178, 183 (Pa. 2006). The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The First Amendment's protection of freedom of expression is made applicable to the states through the Fourteenth Amendment. *Id.*

> When the government restricts expression due to the content of the message being conveyed, such restrictions are allowable only if they pass the strict scrutiny test. That test is an onerous one, and demands that the government show that the restrictions are "(1) narrowly tailored to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

> Yet, strict scrutiny is not applied simply because a plaintiff raises a claim that its freedom of expression has been curtailed. The High Court has recognized that where the governmental regulation applies a content-neutral regulation to expressive conduct, strict scrutiny is an inappropriate test to apply. *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). The test which is applied to such content-neutral regulations was first enunciated in the seminal case of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In *O'Brien*, the defendant was convicted of violating a statute which criminalized the act of destroying or mutilating a

draft card. The defendant had burned his Selective Service registration certificate in order to convince people to adopt his anti-war beliefs. The defendant argued that the conviction could not stand as the statute criminalizing the destruction of draft cards ran afoul of the First Amendment.

In analyzing this claim, the **O'Brien** Court stated that where expressive and nonexpressive conduct are combined in the same activity, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." **Id.** at 376, 88 S.Ct. 1673. The **O'Brien** Court decreed that such "government regulation is sufficiently justified" if:

> 1) Promulgation of the regulation is within the constitutional power of the government;
>
> 2) The regulation furthers an important or substantial governmental interest;
>
> 3) The governmental interest is unrelated to the suppression of free expression; and
>
> 4) The incidental restriction on First Amendment freedoms is no greater than essential to the furtherance of that interest.

**Id.** at 377, 88 S.Ct. 1673. The **O'Brien** Court found that all four prongs were met and thus denied the defendant relief.

**In re Condemnation by Urban Redevelopment Auth. of Pittsburgh**, 913 A.2d at 183–84. **See also Clark v. Community for Creative Non-Violence**, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (observing that content-neutral restrictions on speech are only valid if they are justified without reference to the content of the regulated speech, are narrowly tailored to serve a significant governmental interest unrelated to speech,

and leave open ample alternative channels for communication of the information).[5]

A review of the PFA Order at bar reveals that its proscription suffers from none of the infirmities Appellant alleges in his argument, for the proscription in question is not content-based, clearly advances an important governmental interest unrelated to speech, and is narrowly-tailored to advance this interest. It is undisputed that the proscription, itself, is limited to social and electronic network remarks "regarding Plaintiff." As written, therefore, the proscription is not concerned with the *content* of Appellant's speech but with, instead, the *target* of his speech, namely, Plaintiff, whom the court has already deemed the victim of his abusive conduct.

An abuser's mere posting of any reference to his or her victim on social media, regardless of content, is, thus, automatically considered targeting tantamount to making impermissible *contact* with the victim. For

_____

[5] The Pennsylvania Supreme Court has recognized that Article I, Section 7 of the Pennsylvania Constitution provides broader protections of expression than the related First Amendment guarantee in a number of different contexts. **DePaul v. Com.**, 969 A.2d 536, 546 (Pa. 2009) (citing, *e.g.*, **Ins. Adjustment Bureau v. Ins. Comm'r**, 542 A.2d 1317, 1324 (Pa. 1988) (Article I, Section 7 does not allow prior restraint or other restriction of commercial speech by governmental agency where legitimate, important interests of government may be accomplished in less intrusive manner)). However, we conclude, *infra*, that the PFA Order's proscription could not advance the important governmental interest of preventing victim abuse in social media by a less intrusive manner than simply prohibiting remarks regarding the victim. Accordingly, Appellant's state constitution-based claims are equally unavailing.

an adjudged abuser to refer to a victim in publicly trafficked electronic forums, for whatever reason, is to exercise control over the victim in public, thus perpetuating the abuse of the victim. Whether a remark is patently innocuous or offensive, informational or nonsensical is of no moment under the order as written; it is the mere reference to the victim, alone, that triggers the proscription.

Viewing the PFA Order in light the above-referenced intermediate test applicable to content-neutral, governmental restrictions on speech, we discern no infirmity with its proscription as stated. The provision is narrowly-tailored to advance the important governmental interest at stake, *i.e.*, the cessation of abuse in intimate or formerly intimate relationships, *supra*, while remaining silent as to other channels of communication available to Appellant. Accordingly, we discern no merit to Appellant's constitutional challenge to the PFA order as it applied the PFA in his case.

Judgment of sentence is AFFIRMED.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/7/2016

- 15 -