NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-3301

BEY ET AL., APPELLEES, *v*. RASAWEHR, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Bey v. Rasawehr*, Slip Opinion No. 2020-Ohio-3301.]**

*First Amendment—Prior restraints—R.C. 2903.214—Civil-stalking protection order enjoining future Internet postings about a person imposes an unconstitutional prior restraint on protected speech in violation of the First Amendment to the United States Constitution—Court of appeals' judgment reversed in part.*

(No. 2019-0295—Submitted February 11, 2020—Decided June 16, 2020.)

APPEAL from the Court of Appeals for Mercer County,

Nos. 10-18-02 and 10-18-03, 2019-Ohio-57.

_____

**DONNELLY, J.**

{¶ 1} In this discretionary appeal we are asked to determine whether a civil-stalking protection order enjoining future postings about a petitioner imposes an unconstitutional prior restraint on protected speech in violation of the First

Amendment to the United States Constitution. We conclude that it does. We therefore reverse the judgment of the Third District Court of Appeals.

## I. BACKGROUND

{¶ 2} In November 2015, appellee Joni Bey's husband died. Approximately seven months later, appellant, Jeffrey Rasawehr, Bey's brother, ostensibly began writing and posting public comments on craigslist.org and the Lima News website that accused Bey of having contributed to her husband's death and that further accused local public officials of having failed to investigate the circumstances of his death. In September 2017, after a several-month period of relative quiet, a new barrage of similar public accusations commenced. A billboard located near Bey's home contained a large portrait-style picture of Rasawehr with the message, "Jeff Rasawehr says, 'LEARN ABOUT COUNTY CORRUPTION & COVER-UPS AT…' CountyCoverUp.com." (Capitalization sic.) The website contained a series of Internet postings apparently authored by Rasawehr, including postings dated September 13, October 1, November 2, and November 3, 2017, in which Rasawehr reiterated his accusations against Bey and various local public officials.

{¶ 3} Rasawehr's father died in January 2008. And in June 2016, Rasawehr's mother, appellee Rebecca Rasawehr, began receiving treatment similar to that of Bey. The June 2016 and subsequent 2017 Internet postings, ostensibly authored by Rasawehr, likewise accused Rebecca of having contributed to her husband's death and again accused local public officials of having failed to investigate that death.

{¶ 4} On November 16, 2017, pursuant to R.C. 2903.214, Joni Bey and Rebecca Rasawehr (collectively, "appellees") each filed a petition for a civil-stalking protection order ("CSPO") against Rasawehr. Their petitions, to which various postings allegedly authored by Rasawehr were attached, were heard by the Mercer County Court of Common Pleas on December 4, 2017. Appellees each

testified to the facts set forth in their petitions and the mental distress caused by Rasawehr's postings. Rasawehr invoked his Fifth Amendment right and declined to answer questions put to him by appellees' counsel.

{¶ 5} On January 18, 2018, the trial court granted appellees' petitions and issued CSPOs that prohibited Rasawehr from having any contact with them, directly or indirectly, coming within 500 feet of them, or entering certain protected locations. In paragraph nine of the respective CSPOs ("paragraph nine"), the trial court added the following provision tailored specifically to this case:

> IT IS FURTHER ORDERED: RESPONDENT SHALL REFRAIN from posting about Petitioners on any social media service, website, discussion board, or similar outlet or service and shall remove all such postings from CountyCoverUp.com that relate to Petitioners. Respondent shall refrain from posting about the deaths of Petitioners' husbands in any manner that expresses, implies, or suggests that the Petitioners are culpable in those deaths.

(Capitalization sic.) This order will remain in effect until January 15, 2023.

{¶ 6} Rasawehr appealed and the Third District Court of Appeals affirmed the trial court's judgment in both cases. The court of appeals first found that the evidence in the record supported the trial court's determination that appellees had satisfied their burden to establish that the CSPOs against Rasawehr were warranted. 2019-Ohio-57, ¶ 24-34. The court of appeals rejected Rasawehr's constitutional challenges to paragraph nine. *Id.* at ¶ 35-48. One member of the court dissented but only as to the portion of paragraph nine prohibiting Rasawehr from posting about appellees on any social-media service, website, discussion board, or similar outlet or service, finding that provision to be ambiguous and thus unenforceable. *Id.* at ¶ 50-54 (Zimmerman, P.J., dissenting in part and concurring in part).

{¶ 7} We accepted jurisdiction over Rasawehr's second proposition of law: "Prior restraints on the exercise of free speech are unconstitutional and presumptively invalid." *See* 155 Ohio St.3d 1455, 2019-Ohio-1759, 122 N.E.3d 216.

## II. ANALYSIS

{¶ 8} This case requires us to consider whether paragraph nine of the CSPOs issued by the trial court constitutes a prior restraint on protected speech in violation of the First Amendment to the United States Constitution.[1] To resolve this issue, we will begin by reviewing the law that governs the issuance of CSPOs in Ohio. We will then consider the First Amendment principles governing regulations of speech that Rasawehr alleges have been violated. Finally, we will apply those principles to paragraph nine of the CSPOs issued in this case.

### A. Ohio CSPOs

{¶ 9} R.C. 2903.211 prohibits menacing by stalking. R.C. 2903.211(A) provides:

> (1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. * * *
>
> (2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or

---

1. Rasawehr's appeal does not claim protection under Article I, Section 11 of the Ohio Constitution ("Freedom of speech; of the press; of libels"), so we do not consider whether Ohio's constitution is violated by paragraph nine.

telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

{¶ 10} " 'Pattern of conduct' means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents."  R.C. 2903.211(D)(1).

{¶ 11} "Mental distress" means "[a]ny mental illness or condition that involves some temporary substantial incapacity," R.C. 2903.211(D)(2)(a), or that "would normally require psychiatric treatment, psychological treatment, or other mental health services," R.C. 2903.211(D)(2)(b).

{¶ 12} " 'Post a message' means transferring, sending, posting, publishing, disseminating, or otherwise communicating, or attempting to transfer, send, post, publish, disseminate, or otherwise communicate, any message or information, whether truthful or untruthful, about an individual, and whether done under one's own name, under the name of another, or while impersonating another."  R.C. 2903.211(D)(7).

{¶ 13} R.C. 2903.214 provides a civil remedy for stalking victims.  R.C. 2903.214(C) states:

A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court.  The petition shall contain or state all of the following:

(1) An allegation that the respondent is eighteen years of age or older and engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order or committed a sexually oriented offense against the person to be protected by the protection order, including a description of the nature and extent of the violation;

&ast; &ast; &ast;

(3) A request for relief under this section.

{¶ 14} R.C. 2903.214(E)(1)(a) states:

After an ex parte or full hearing, the court may issue any protection order, with or without bond, that contains terms designed to ensure the safety and protection of the person to be protected by the protection order, including, but not limited to, a requirement that the respondent refrain from entering the residence, school, business, or place of employment of the petitioner or family or household member.

{¶ 15} A person who violates a CSPO is subject to criminal prosecution for a violation of R.C. 2919.27 and may be punished for contempt of court. R.C. 2903.214(K).

{¶ 16} A CSPO issued pursuant to R.C. 2903.214 is a " 'special statutory remedy that is designed to prevent violence &ast; &ast; &ast;.' " *J.P. v. T.H.,* 9th Dist. Lorain No. 15CA010897, 2017-Ohio-233, ¶ 28, quoting *Oliver v. Johnson*, 4th Dist. Jackson No. 06CA16, 2007-Ohio-5880, ¶ 1. "The goal of R.C. 2903.214 is to allow the police and the courts to act *before* a victim is harmed by a stalker." (Emphasis sic.) *Irwin v. Murray,* 6th Dist. Lucas No. L-05-1113, 2006-Ohio-1633, ¶ 15.

R.C. 2903.214 "does not create a tort remedy" to compensate the victim for damages. *J.P.* at ¶ 28, citing *Oliver* at ¶ 1. Instead, it provides expeditious remedies that "are in addition to, and not in lieu of, any other available civil or criminal remedies," R.C. 2903.214(G)(1); *see also J.P.* at ¶ 28.

{¶ 17} In this case, the trial court found upon a preponderance of the evidence that Rasawehr had engaged in a pattern of conduct that was the proximate cause of the fear and mental distress experienced by appellees. The court further found that Rasawehr authored the Internet postings depicted in appellees' hearing exhibits "with the knowledge, if not the intent, that his posting of the information would cause each of the [appellees] fear and mental distress." Appellees' mental distress "included losing sleep, unwanted communication and, in response to questions by others who have viewed the information on the various websites, their resulting reluctance to be seen in public due to embarrassment, worry, anxiety, and humiliation as evidenced by petitioner Bey seeking and receiving psychological counseling and petitioner Rebecca Rasawehr taking anxiety medication." Further, the court concluded that the anxiety of each appellee had "risen to the extent that each fear[ed] physical harm may be inflicted upon them" by Rasawehr. Concluding that Rasawehr had violated R.C. 2903.211(A), the trial court issued CSPOs pursuant to R.C. 2903.214.

{¶ 18} Rasawehr does not contest the trial court's decision to issue CSPOs. He instead contests only the relief ordered in paragraph nine of the CSPOs, arguing specifically that the trial court's order that he refrain from posting about appellees on any social-media service, website, discussion board, or similar outlet or service and that he refrain from posting about the deaths of appellees' husbands in any manner that expressed, implied, or suggested that appellees were culpable in those deaths is a prior restraint on free speech that violates the First Amendment to the United States Constitution.

## B. The First Amendment and Prior Restraints

{¶ 19} The First Amendment to the United States Constitution provides in part that "Congress shall make no law * * * abridging the freedom of speech." "[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States * * *." *Manhattan Community Access Corp. v. Halleck*, ___ U.S. ___, 139 S.Ct. 1921, 1928, 204 L.Ed.2d 405 (2019).

{¶ 20} " '[A]s a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." ' " *Ashcroft v. Am. Civil Liberties Union,* 535 U.S. 564, 573, 122 S.Ct. 1700, 1521 L.Ed.2d 771 (2002), quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d. 469 (1983), quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

{¶ 21} The right to free speech secured by the First Amendment is not absolute, however, and the government may regulate it in a manner that is consistent with the Constitution. *See Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

{¶ 22} A regulation of speech that is content-based is presumptively unconstitutional and is subject to strict scrutiny, which requires that it be the least restrictive means to achieve a compelling state interest. *See Reed v. Gilbert,* ___U.S. ___, 135 S.Ct. 2218, 2226-2227, 192 L.Ed.2d 236 (2015); *see also McCullen v. Coakley,* 573 U.S. 464, 478, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014); *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *Sable Communications of California, Inc. v. Fed. Communications Comm.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).

{¶ 23} Content-neutral regulations limiting the time, place, and manner of speech are constitutional as long as they promote "important governmental interests

unrelated to the suppression of free speech, and do[] not burden substantially more speech than necessary to further those interests." *Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.,* 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), syllabus. *See also McCullen* at 486; *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

{¶ 24} Like statutes that regulate speech, court-ordered injunctions that regulate speech are also subject to First Amendment scrutiny. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 757, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

{¶ 25} Rasawehr argues that paragraph nine imposes a "prior restraint" on his First Amendment right to free speech. "The term 'prior restraint' is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " (Emphasis added in *Alexander*.) *Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), quoting Nimmer, *Nimmer on Freedom of Speech*, Section 4.03, at 4-14 (1984). *See also State ex rel. Toledo Blade Co. v. Henry Cty. Court of Common Pleas,* 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, ¶ 20, quoting 2 Smolla, *Smolla and Nimmer on Freedom of Speech*, Section 15.1, at 15-4 (2009) (prior restraint refers to " 'judicial orders or administrative rules that operate to forbid expression before it takes place' "). "Temporary restraining orders and permanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander* at 550.

{¶ 26} A prior restraint is not unconstitutional per se but bears " 'a heavy presumption against its constitutional validity.' " *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d (1963). *See also New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d

822 (1971). For example, in *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 415-417, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971)*,* an Illinois court enjoined a "racially integrated community organization" that was critical of a local real-estate broker's business practices " 'from passing out pamphlets, leaflets or literature of any kind, and from picketing, anywhere in the City of Westchester, Illinois.' " The United States Supreme Court ordered that the injunction be vacated, noting:

> It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under *Near v. Minnesota*, 283 U.S. 697 (1931) [51 S.Ct. 625, 75 L.Ed. 1357], the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights. Here, as in that case, the injunction operates, not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature "of any kind" in a city of 18,000.

*Id.* at 418-419. The court noted that even if the petitioners' peaceful distribution of literature was intended to have a coercive impact on the respondent's business practices, that "d[id] not remove them from the reach of the First Amendment." *Id.* at 419. The court declared:

> No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court. Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature

revealed by this record. * * * [R]espondent is not attempting to stop the flow of information into his own household, but to the public. Accordingly, the injunction issued by the Illinois court must be vacated.

(Citation omitted.) *Id.* at 419-420.

{¶ 27} The fact that expression may now occur in "cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and social media in particular," *Packingham v. North Carolina,* ___U.S.___, 137 S.Ct 1730, 1735, 198 L.Ed.2d 273 (2017), does not mean that governmental regulation of that speech is beyond the reach of First Amendment analysis and scrutiny. *See Packingham* at 1735-1737 (invalidating a North Carolina statute that prohibited registered sex offenders from accessing commercial social-networking websites); *see also Toledo Blade Co.*, 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, at ¶ 25, quoting *Citizens United v. Fed. Elections Comm.*, 558 U.S. 310, 326, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (notwithstanding the emergence of "revolutionary changes in the delivery of information to the public" through the Internet and other forms of mass communication, " '[c]ourts, too, are bound by the First Amendment * * * [and] [w]e [must] decline to draw, and then redraw, constitutional lines based on the particular media or technology used' ").

{¶ 28} Therefore, we must decide whether paragraph nine of the CSPOs enjoining Rasawehr from posting about appellees imposed an unconstitutional prior restraint on his First Amendment right to free speech. In doing so, we confront the practical conundrum such proceedings can present:

Compared to subsequent punishment for crimes of violence, civil harassment orders are easy to obtain and easy to enforce. These are

their chief virtues. Compared to subsequent punishment for speech, prior restraints are also easy to obtain and easy to enforce. These are their chief vices.

Caplan, *Free Speech and Civil Harassment Orders,* 64 Hastings L.J. 781, 824 (2013).

### III. APPLICATION OF THE FIRST AMENDMENT
### TO PARAGRAPH NINE

{¶ 29} Rasawehr contends that by enjoining him from future posting of messages about appellees, the CSPOs include an unconstitutional prior restraint on expression covered by the First Amendment. We therefore consider these prohibitions in light of First Amendment jurisprudence.[2]

### A. Content-based vs. content-neutral restrictions

{¶ 30} Because these injunctive orders regulate speech, we must first determine whether these regulations are content-based or content-neutral. *See McCullen,* 573 U.S. at 478, 134 S.Ct. 2518, 189 L.Ed.2d 502 ("we think it unexceptional to perform the first part of a multipart constitutional analysis first").

{¶ 31} "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed,* ___U.S.___, 135 S.Ct. at 2227, 192 L.Ed.2d 236. A law is content based "if it require[s] 'enforcement authorities' to 'examine the content of

---

2. Rasawehr does not articulate any argument contesting the provision of paragraph nine that ordered him to remove *prior* postings from CountyCoverUp.com that related to appellees. *Compare Coleman v. Razete,* 2019-Ohio-2106, 137 N.E.3d 639, ¶ 31 (1st Dist.) (order "[r]equiring [respondent] to remove all existing references to [petitioner] from internet or social-networking sites that [respondent] operate[d] or control[led] was narrowly tailored to redress the specific pattern of conduct that [respondent] had engaged in to knowingly cause [petitioner] mental distress" and to prevent further mental distress to petitioner, while also "safeguard[ing] free speech concerns"). Because Rasawehr does not contest that provision here and the ordered removal of prior postings would not in any case amount to a prior restraint, we do not consider that provision further in this case.

the message that is conveyed to determine whether' a violation has occurred." *McCullen* at 479, quoting *Fed. Communications Comm. v. League of Women Voters of California.,* 468 U.S. 364, 383, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). A law is also content-based if it is "concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech.' " *McCullen* at 481, quoting *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

{¶ 32} Paragraph nine of the CSPOs ordered Rasawehr to (1) refrain from posting about appellees on any social-media service, website, discussion board, or similar outlet or service and (2) refrain specifically from posting about the deaths of appellees' husbands in any manner that expressed, implied, or suggested that appellees were culpable in those deaths. Putting aside for the moment the extraordinary scope of these injunctions, we can only conclude that they are intended to regulate the subject matter, the content of speech, or both.

{¶ 33} A regulation of speech that is "about" appellees is necessarily a regulation of the subject matter of that speech. The first sentence of paragraph nine fully regulates and in this case puts limits on any expression that relates to that particular subject, i.e., appellees. And the regulation of speech in the second sentence of paragraph nine about the deaths of appellees' husbands that says anything about possible culpability regulates not only the subject matter but also the message. It is inescapable that a regulation of speech "about" a specific person (or likely any other specific subject of discussion) is a regulation of the content of that speech and must therefore be analyzed as a content-based regulation.

{¶ 34} For their part, appellees do not seriously dispute that the regulation of speech concerning their alleged culpability in the deaths of their husbands is a content-based regulation. Appellees do, however, dispute that the prohibition from posting about them in general is content-based and instead contend that this is a content-neutral regulation. They rely on *Commonwealth v. Lambert*, 2016 PA

Super 200, 147 A.3d 1221 (Pa.Super.Ct.2015), in which the Superior Court of Pennsylvania, the state's intermediate appellate court, reviewed a comparable protective order and ruled that the prohibition was "not concerned with the *content* of Appellant's speech but with, instead, the *target* of his speech, namely, Plaintiff, whom the court has already deemed the victim of his abusive conduct." (Emphasis sic.) *Id.* at 1229.

{¶ 35} But the "target" of such speech necessarily concerns the subject matter of the speech. It "cannot be justified without reference to the content of the prohibited communication." *People v. Relerford*, 2017 IL 121094, 422 Ill.Dec. 774, 104 N.E.3d 341, 350 (2017). It requires an examination of its content, i.e, the person(s) being discussed, to determine whether a violation has occurred and is concerned with undesirable effects that arise from " 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech," *McCullen*, 573 U.S. at 481, 134 S.Ct. 2518, 189 L.Ed.2d 502, quoting *Boos*, 485 U.S. at 321, 108 S.Ct. 1157, 99 L.Ed.2d 333. We therefore cannot accept appellees' attempt to characterize the order banning all posted speech about them as merely a content-neutral regulation.

{¶ 36} Nor can the prohibitions in paragraph nine be considered merely incidental to a regulation of conduct. *See O'Brien*, 391 U.S. at 376-377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (act of burning Selective Service registration certificate could be prosecuted for violation of law prohibiting destruction of registration certificates even if conduct was intended to express an idea or belief). On the contrary, the regulation of expressive activity is the obvious purpose of paragraph nine of the CSPOs here.

{¶ 37} We therefore conclude that the prohibition of certain future speech by paragraph nine is a content-based regulation.

### B. Exception for speech integral to criminal conduct

{¶ 38} Having determined that speech was being regulated on the basis of its content does not necessarily mean, however, that it cannot be regulated. The

First Amendment does " 'permit[] restrictions upon the content of speech in a few limited areas.' " *United States v. Stevens,* 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010), quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 382-383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). Those categories include: "advocacy intended, and likely, to incite imminent lawless action; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words,'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has the power to prevent * * *." (Citations omitted.) *United States v. Alvarez*, 567 U.S. 709, 717, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality opinion).

{¶ 39} In this case, the court of appeals suggested—but did not actually decide—that Rasawehr's restrained speech could have been " 'integral to criminal conduct,' " 2019-Ohio-57, at ¶ 40, quoting *Alvarez* at 721, and thus within a class of "unprotected speech," *id*. at ¶ 39. Appellees more directly contend that Rasawehr's speech is "categorically unprotected" because it is "speech integral to criminal conduct."[3] For support, appellees cite *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949). In *Giboney,* unionized ice peddlers picketed against Empire Storage and Ice Company after it refused to agree not to sell ice to nonunion peddlers, a practice that would have violated Missouri's antitrade-restraint law. When Empire sued to enjoin the picketing, the union answered by asserting a constitutional right to picket for the purpose of forcing Empire to discontinue its sale of ice to nonunion peddlers.

{¶ 40} Upholding the trial court's picketing injunction against the union, the United States Supreme Court ruled that all of the union's activities "constituted a single and integrated course of conduct, which was in violation of Missouri's valid law." *Id*. at 498. The court expressly rejected the suggestion "that the constitutional freedom for speech and press extends its immunity to speech or

_____

3. Appellees do not contend that Rasawehr's restrained speech could be subject to regulation on the other possibly applicable categories such as defamation or true threats.

writing used as an integral part of conduct in violation of a valid criminal statute." *Id*. According to the court, "the injunction did no more than enjoin an offense against Missouri law, a felony." *Id*. Because the "sole, unlawful immediate objective" of the expressive activity was to "induce Empire to violate Missouri law by acquiescing in unlawful demands," prohibiting that expressive activity did not violate rights protected by the First Amendment. *Id*. at 502. The court explained:

> [It] has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society.

(Citations omitted.) *Id*.

{¶ 41} According to appellees, Rasawehr's postings are integral to the criminal conduct of menacing by stalking in violation of R.C. 2903.211(A). But there has been no judicial determination here that future postings Rasawehr might make will be integral to the commission of the crime and thus unprotected by the First Amendment. "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). Speech may not be categorically suppressed by means of a prior restraint absent a judicial determination that the speech would be unprotected by the First Amendment. *See Freedman v. Maryland*, 380 U.S. 51,

58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) ("because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint").

{¶ 42} Our decision in *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), is instructive. In that case, the plaintiff, a landlord, alleged that the defendant, a tenant-organization, had compiled and published a list of landlords about whom defendant had received the most complaints. The plaintiff alleged that the list contained false and defamatory information about him. The plaintiff's complaint requested various forms of injunctive relief that would enjoin the defendant from disseminating allegedly defamatory information in the future. The trial court dismissed the complaint because the plaintiff "had not 'met the heavy burden of justifying prior restraint.' " *Id*. at 244. The court of appeals reversed, determining that if the trial court found the defendant's statements to be defamatory, "then the question whether defendant should be enjoined from future repetition of the same statements could properly be before the court." *Id*. at 245.

{¶ 43} We affirmed the judgment of the court of appeals in *O'Brien*, stating:

> Once speech has judicially been found libelous, if all the requirements for injunctive relief are met, an injunction for restraint of continued publication of that *same* speech may be proper. The judicial determination that specific speech is defamatory must be made prior to any restraint. *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 149 [87 S.Ct. 1975, 18 L.Ed.2d 1094].
>
> In an analogous area, dealing with obscene materials, the United States Supreme Court, in *Southeastern Promotions v.*

*Conrad* [420 U.S. 546, 558-559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)], said:

"* * * The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable. *See Speiser v. Randall*, 357 U.S. 513 (1958) [78 S.Ct. 1332, 2 L.Ed.2d 1460]."

Speaking of allowable remedies available, that same court, in *Kingsley Books, Inc. v. Brown* (1957), 354 U.S. 436, 437, [77 S.Ct. 1325, 1 L.Ed.2d 1469,] said:

"* * * 'limited injunctive remedy,' under closely defined procedural safeguards, against the sale and distribution of written and printed matter found *after due trial* to be obscene [may be allowed] * * *." (Emphasis added.)

*Id*. at 245-246.

{¶ 44} Because the plaintiff's complaint in *O'Brien* sought to prospectively enjoin further publication of allegedly defamatory information, we held that such relief could be awarded if the plaintiff's allegations—"that files of a false and defamatory nature are being used to coerce the public into refusing to rent from him"—could be substantiated. *Id*. at 246. Thus, *O'Brien* confirms that before a court may enjoin the future publication of allegedly defamatory statements based

on their content, there must first be a judicial determination that the subject statements were in fact defamatory. *Id*.

{¶ 45} In the case before us, however, there has been no such judicial determination that future postings by Rasawehr will be an integral means to criminal conduct and thus unprotected by the First Amendment.

{¶ 46} Even if the trial court here determined solely for purposes of civil protection that Rasawehr violated R.C. 2903.211(A), there has been no valid judicial determination that any *future* expression Rasawehr might make *to others* through posted messages would necessarily be integral to the criminal conduct of menacing by stalking in violation of R.C. 2903.211(A). Even if *past* speech that an offender made *to* a person that the offender knew would cause that person to believe that the offender would cause physical harm to that person or would cause mental distress to that person could be considered speech that was integral to the criminal conduct of menacing by stalking, we do not believe that this principle may be applied categorically to *future* speech—that is by its nature uncertain and unknowable—directed *to others*.

{¶ 47} Because of the uncertainty inherent in evaluating *future* speech that has yet to be expressed, the record here cannot justify a content-based prior restraint on speech when there has been no valid judicial determination that such speech will be integral to criminal conduct, defamatory, or otherwise subject to lawful regulation based on its content.

{¶ 48} When it comes to speech, the application of a criminal law should generally occur after the contested speech takes place, not before it is even uttered. As observed by the United States Supreme Court in *Carroll v. President & Commrs. of Princess Anne,* 393 U.S. 175, 180-181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968),

Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgement.

**{¶ 49}** For their part, appellees rely on federal-court decisions that have upheld the constitutionality of the federal stalking statute, 18 U.S.C. 2261A.[4] *See United States v. Gonzalez*, 905 F.3d 165 (3d Cir.2018); *United States v. Osinger,* 753 F.3d 939 (9th Cir.2014); *United States v. Sayer*, 748 F.3d. 425 (1st Cir.2014); *United States v. Petrovic,* 701 F.3d 849 (8th Cir.2012). But those decisions are inapposite here inasmuch as they involved prosecutions and convictions under that federal statute for *past* speech that was integral to the course of criminal conduct. By contrast, there has been no criminal prosecution and conviction of Rasawehr for having engaged in menacing by stalking in violation of R.C. 2903.211 or any other offenses relating to his statements about appellees. More importantly, none of those cases involved prior restraints on future speech like those imposed here by paragraph nine.

---

4. 18 U.S.C. 2261A(2) prohibits whoever

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce, to engage in a course of conduct that—
>     (A) places that person in reasonable fear of the death of or serious bodily injury to a person * * * or
>     (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person * * *.

{¶ 50} Because there was no valid judicial determination that any future Internet postings that Rasawehr might make about appellees would necessarily be integral to the criminal conduct of menacing by stalking in violation of R.C. 2903.211(A), or that such postings would be defamatory or otherwise proscribable, that future expression would not be excluded categorically from First Amendment protection. The trial court's CSPOs thus represent prior restraints that are unconstitutional unless they can survive strict scrutiny. *See Toledo Blade Co.*, 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, at ¶ 21.

### C. Application of strict scrutiny

{¶ 51} A content-based regulation of protected speech cannot be sustained unless it is the least restrictive means to achieve a compelling state interest. *See Reed*, __ U.S. __, 135 S.Ct. at 2231, 192 L.Ed.2d 236; *McCullen*, 573 U.S. at 478, 134 S.Ct. 2518, 189 L.Ed.2d 502; *Playboy Entertainment Group, Inc.,* 529 U.S. at 813, 120 S.Ct. 1878, 146 L.Ed.2d 865; *Sable Communications of California, Inc.*, 492 U.S. at 126, 109 S.Ct. 2829, 106 L.Ed.2d 93. Assuming, without deciding, that there is a compelling state interest in protecting civil-stalking victims from fear of imminent physical harm or mental distress, the means chosen here are not the least restrictive. The scope of paragraph nine, which prohibits Rasawehr from posting *anything* about appellees is remarkable. It has no defined limits. Anything that Rasawehr might ever post about appellees, no matter how innocuous, would conceivably subject him to proceedings for contempt of court if not criminal prosecution under R.C. 2919.27 for violating the CSPO. By any measure, this regulation of speech is demonstrably overbroad.

{¶ 52} In *Flood v. Wilk*, 430 Ill.Dec. 96, 2019 IL App (1st) 172792, 125 N.E.3d 1114, 1116-1117 (2019), the pastor of a church obtained a "stalking no contact order" that, among other things, prevented the respondent from "communicating, publishing or communicating, in any form any writing naming or

regarding [the pastor], his family or any employee, staff or member" of the pastor's church congregation. Vacating that part of the order, the appellate court stated:

> Since the trial court's order in the instant case targeted respondent's speech based on its subject matter—the church or its members—it would be considered a content-based restriction and presumptively prohibited. An injunction that prohibits respondent from writing *anything* at all about his pastor or any other member of his church congregation—whether flattering or unflattering, fact or opinion, innocuous or significant, and regardless of the medium of communication—certainly would not be that rare case that survives strict scrutiny. It is all but impossible to imagine a factual record that would justify this blanket restriction on respondent's speech. Paragraph (b)(5) of the order is substantially and obviously overbroad, and it violates respondent's first-amendment right to free speech.

(Emphasis sic.) *Id*. at 1126.

{¶ 53} Not unlike the order in *Flood* that prohibited the respondent from writing anything about the pastor or any employee or member of the church, the orders issued here prohibited Rasawehr from writing anything about appellees "on any social media service, website, discussion board, or similar outlet or service." Nothing in the record before us justifies such an utterly sweeping restriction on First Amendment expression. Nor does it justify the attempt to limit its censorship to postings about the deaths of appellees' husbands or appellees' alleged culpability in their husbands' deaths.

{¶ 54} Appellees maintain that paragraph nine was narrowly tailored to limit the exercise of free speech to only the degree necessary to achieve the

22

compelling state interest of protecting them from "stalking and harassment" and that no less restrictive alternative would be as effective. But we fail to see how an order that prohibits Rasawehr from posting *anything* about appellees either protects them from certain mental distress or prohibits only distress-causing speech. To the contrary, it prohibits everything. And while the restraint on postings about appellees concerning their alleged culpability in the deaths of their husbands bears at least some factual relation to the allegations contained in their petitions, it suffers from the same fatal flaw by suppressing all expression about that topic regardless of whether it causes mental distress cognizable under R.C. 2903.211(D)(2)(a) and (b). Neither the trial court nor the court of appeals made these First Amendment sensitive determinations in this case.

{¶ 55} We by no means discount any mental distress and embarrassment that appellees experienced, nor do we doubt that future statements may cause additional mental anguish. But speech does not lose its protected character simply because it may be upsetting and cause distress or embarrassment. *See Snyder v. Phelps*, 562 U.S. 443, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (antimilitary and homophobic statements near funeral for serviceman killed in action was protected despite jury's finding that it was "outrageous" as an element of intentional infliction of emotional distress); *Natl. Assn. for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) ("Speech does not lose its protected character * * * simply because it may embarrass others or coerce them into action").

{¶ 56} Moreover, appellees are not without civil tort remedies to redress any cognizable injuries they claim to have suffered as a result of Rasawehr's statements about them, including but not necessarily limited to actions for defamation. But the special statutory process to provide expedited civil relief to stalking victims under R.C. 2903.214 serves primarily to protect victims from imminent threats of physical harm and mental distress. It is not designed to be a

shortcut or substitute for conventional civil remedies and thus is not the appropriate means to obtain the panoply of monetary damages and injunctive relief that may properly be awarded through such proceedings. In any case, the potential abuse of speech rights in the future cannot justify the blanket prohibition imposed here on Rasawehr's speech before it has even been uttered.

{¶ 57} Here, the court of appeals observed that "not all speech is of equal First Amendment importance," 2019-Ohio-57, at ¶ 41, and that "[i]t is speech on ' "matters of public concern" ' that is 'at the heart of the First Amendment's protection,' " *id.*, quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-759, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), quoting *First Natl. Bank of Boston v. Bellotti*, 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), citing *Thornhill v. Alabama*, 310 U.S. 88, 101, 60 S.Ct. 736, 84 L.Ed 1093 (1940). Appellees similarly maintain, in defending the CSPOs under strict scrutiny, that the value of Rasawehr's speech concerning private matters is "decidedly low" when balanced against the interest in upholding the CSPOs. They rely on *Snyder*, in which the United States Supreme Court reviewed a jury verdict that held a church and its leaders liable for the emotional distress caused by their protest using antimilitary statements and homophobic slurs near an American serviceman's funeral. The court ruled that "[w]hether the First Amendment prohibits holding [the church] liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case." *Id.* at 451. Because the speech at issue in *Snyder* involved matters of public concern, to include "the political and moral conduct of the United States and its citizens" and "homosexuality in the military," *id.* at 454, it was "entitled to 'special protection' " and the court set aside the jury's verdict against the church, *id.* at 458-459.

{¶ 58} In their brief to this court, appellees claim that in contrast to *Snyder*,

24

> Rasawehr's speech (1) consists of a barrage of personal attacks blended with just enough public criticism to create an illusion of public debate; (2) is, by Rasawehr's own admission, motivated by a personal grudge against his family evidenced by the content of his writings; and (3) did not take place on a public street.

As appellees must concede, however, Rasawehr's statements purported to implicate local public officials in an alleged criminal conspiracy. The United States Supreme Court has said that " 'speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.' " *Snyder*, 562 U.S. at 452, 131 S.Ct. 1207, 179 L.Ed.2d 172, quoting *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Such speech is protected by the First Amendment even though the speaker or writer was motivated by hatred or ill-will. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 53, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) ("while * * * a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures"); *see also Garrison v. Louisiana,* 379 U.S. 64, 73, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

{¶ 59} In any case, our role here is not to pass judgment on the truth, plausibility, or First Amendment value of Rasawehr's allegations. To the extent his statements involve matters of both private and public concern, we cannot discount the First Amendment protection afforded to that expression. We most assuredly have no license to recognize some new category of unprotected speech based on its supposed value. Rejecting such a "free-floating test for First Amendment coverage," the United States Supreme Court declared in *Stevens,* 559 U.S. at 470, 130 S.Ct. 1577, 176 L.Ed.2d 435, that the First Amendment's guarantee of free speech "does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." "Our decisions * * *

cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *Id.* at 472.

{¶ 60} Prior restraints on First Amendment expression are presumptively unconstitutional. Because paragraph nine of the CSPOs is content based and does not survive strict scrutiny, we hereby vacate those portions of paragraph nine that enjoin Rasawehr from future postings about appellees or that express, imply, or suggest that appellees were culpable in the deaths of their husbands.

## IV. CONCLUSION

{¶ 61} The CSPOs issued here undoubtedly sought to provide some measure of relief to appellees for the mental distress they experienced because of Rasawehr's public accusations. But the means chosen to provide that relief—with its virtually unlimited restraint on the content of future postings about appellees— went far beyond anything that the factual record before us can sustain and the First Amendment can tolerate. We therefore reverse the judgment of the Third District Court of Appeals to the extent that it upheld the trial court's CSPOs enjoining future postings about appellees or postings that express, imply, or suggest that appellees were culpable in the deaths of their husbands, and we vacate those provisions of paragraph nine that prohibited such future postings and remand this matter to the trial court for further proceedings consistent with this opinion.

Judgment reversed in part
and cause remanded.

O'CONNOR, C.J., and KENNEDY, FRENCH, FISCHER, DEWINE, and STEWART, JJ., concur.

––––––––––––––––––

Miltner Reed, L.L.C., Ryan K. Miltner, and Kristine H. Reed, for appellees.
Sawan & Sawan, L.L.C., and Dennis E. Sawan, for appellant.

Legal Aid Society of Cleveland, Alexandria M. Ruden, Haley K. Martinelli, and Tonya D. Whitsett; and Micaela C. Deming, urging affirmance for amici curiae Legal Aid Society of Cleveland and Ohio Domestic Violence Network.

Scott & Cyan Banister First Amendment Clinic, UCLA School of Law and Eugene Volokh; and Law Office of Karin L. Coble and Karin L. Coble, urging reversal for amici curiae Electronic Frontier Foundation, 1851 Center for Constitutional Law, and Professors Jonathan Entin, David F. Forte, Andrew Geronimo, Raymond Ku, Stephen Lazarus, Kevin Francis O'Neill, Margaret Tarkington, Aaron H. Caplan, and Eugene Volokh.

Fritz Byers, urging reversal for amicus curiae Block Communications, Inc.

_____