[Cite as *J.B. v. O.S.Y.*, 2022-Ohio-3226.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| J.B., | : | |
| Petitioner-Appellee, | : | |
| v. | : | No. 110623 |
| O.S.Y., ET AL., | : | |
| Respondents. | : | |
| [Appeal by J.D., Respondent.] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** September 15, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-934899

### *Appearances:*

The Pattakos Law Firm LLC and Peter G. Pattakos, *for appellant*.

MATASAR JACOBS LLC, Christopher B. Congeni, and Douglas G. Walters; Hilow & Spellacy Co., LLC, and Kevin M. Spellacy, *for appellee*.

LISA B. FORBES, J.:

{¶ 1} J.D. appeals the trial court's order issuing a civil stalking protection order ("CSPO") against him. After reviewing the facts of the case and pertinent law, we reverse the lower court's judgment.

## I. Facts and Procedural History

{¶ 2} In the summer of 2020, a Cleveland-based group called With Peace We Protest ("WPWP") held five protests at three local restaurants affiliated with Robert George ("George") and a company he owns, Ethos Hospitality Group ("Ethos"). On June 19, 2020, WPWP held a protest at TownHall. On June 27, 2020, WPWP held consecutive protests at TownHall, Harry Buffalo, and Barley House. On July 12, 2020, WPWP held another protest at TownHall. According to WPWP, the organization was protesting George's alleged "unethical business practices."

{¶ 3} J.D. is a founding member of WPWP, and he was part of all five protests. J.B. is George's cousin, and she works as the director of operations at Ethos. J.B. was also present at all five of the protests at issue in the case at hand.

{¶ 4} On July 15, 2020, J.B. filed a petition for a CSPO against J.D. and O.S.Y., who is one of the protesters, based on the parties' encounters at the protests. The magistrate granted the ex parte CSPO against J.D. and O.S.Y. on the same day. After holding a three-day hearing on August 3, 2020, August 26, 2020, and January 15, 2021, the magistrate denied the full CSPO against O.S.Y. and granted the full CSPO against J.D., restraining his movement in relation to J.B. until July 15, 2025.

{¶ 5} The court overruled J.D.'s objections to the magistrate's decision, adopted the decision in its entirety, and issued its own additional findings of fact and conclusions of law on June 28, 2021. It is from this order that J.D. appeals.

## II. Hearing Testimony

### A. J.B.

{¶ 6} J.B. testified that as part of her job at Ethos, she travels from "restaurant to restaurant." J.B. encountered J.D. at Barley House, Harry Buffalo, and TownHall while J.D. was protesting with WPWP. Asked if any of the "conversations" she has had with J.D. have been threatening, J.B. answered, "Yes."

#### 1. The June 19, 2020 Protest

{¶ 7} J.B. testified that the first protest was at TownHall on June 19, 2020. According to J.B., at this protest, J.D. screamed "F*** TownHall" over and over and he "threatened" and "followed" George into the Family Dollar store across the street. J.B. also testified that J.D. and "another girl like started getting super aggressive. They came up to the gate and said you should come over this gate and we'll f****** show you whatever." J.B. explained that "a couple of them [were] encouraging me to come over the fence so they can show me what they're going to do in my personal space." Asked why "they" wanted J.B. to come over the fence, she responded, "So that they could whoop my a**." J.B. also testified that no threats were made against her on June 19, 2020.

#### 2. The June 27, 2020 Protests

{¶ 8} J.B. testified that on Saturday June 27, 2020, J.D. went to Harry Buffalo, Barley House, and TownHall to protest.

{¶ 9} J.B. testified that at the Harry Buffalo protest, J.D.

> told me I was a stupid f****** b**** and that my — and that my p****
> smells and some — like he wouldn't f*** me or — it was disgusting.

And he started getting aggressive. And there was another person named Chris that was there who told him to calm down because he was — I don't know.

Like I don't — I'm like superuncomfortable saying it but I don't know. He just called me an ugly b**** and then proceeded —

{¶ 10} Asked if any of J.D.'s statements were sexually suggestive, J.B. answered, "Yes." J.B. testified that she eventually put her "AirPods in and stopped talking to them which then they went up to me and said f*** you over and over."

{¶ 11} J.B. testified that J.D. then went to Barley House to protest. J.B. also went to Barley House "to make sure that the door was handled appropriately." According to J.B., she was further back from the protesters at Barley House, and she had no interaction with J.D.

{¶ 12} J.D. next went to TownHall to protest. J.B. also went to TownHall, but she "tried to stay inside because of what happened at Harry Buffalo and how aggressive [J.D.] got * * *." According to J.B., she became aware of a fight that occurred at Barley House involving "a girl and I think [J.D.] was involved."

{¶ 13} Asked what J.D. did "to threaten you personally" at the June 27, 2020 protest, J.B. responded as follows: "He specifically told me that — and I'll repeat — that my p***y stinks and that he wouldn't f*** me * * *." According to J.B., this did not upset her "at all."

### 3. The July 12, 2020 Protest

{¶ 14} J.B. testified that the final protest took place at TownHall on July 12, 2020. J.D. attended the protest, and J.B was working at the "back gate" of TownHall that day. Her job duties were "to provide people masks if they needed one, check

IDs, and help people get to their seats." According to J.B., the city was supposed to bring barricades because they brought them to the protests on June 19, 2020, and June 27, 2020, but there were no barricades on July 12, 2020. This allowed the protesters to get closer to the establishment than had been possible at the previous protests.

{¶ 15} According to J.B., she had her "personal first interaction" with J.D. at the July 12, 2020 protest. J.D. and the other protestors came to the back door of TownHall. J.B. testified that she was "fearful" of them when she saw them, "especially because the police did not bring us barricades." According to J.B., she tried to make a police report to the officers stationed in squad cars at the protest, but they would not roll down their car windows. J.B. called the police "so many times" but, according to J.B., the police informed her that they were instructed not to interfere with the protest. J.B. testified that she "called 9-1-1 and they kept hanging up on me because the police were there."

{¶ 16} J.B. testified that J.D. and other protesters "were walking through saying that they're — going like in front of me and they said that they know where I live or we know where you live. We're going to catch you while you're sleeping. That's how you get them. You catch them while they sleep." J.B. further testified that the protestors said "they'll * * * take us out. And that they knew where we lived and that they were going to go there later that night." J.B. further testified that J.D. and another protester "talked about going to [George's] later that night." Another

protester stated to J.D. that "[w]e're going to find out where he lives." J.B. testified that J.D. and the other protester were talking about George.

{¶ 17} J.B. testified that the protesters "constantly blew" their blowhorns and she viewed this "as an escalation in their protest." The protesters were doing this "within four feet, within three feet" of where she was standing. According to J.B., J.D. "had the blowhorn" at the July 12, 2020 protest.

{¶ 18} According to J.B., she went to the emergency room "the night after the protest because [her] ears were ringing and [she] had a migraine that [she] still [has] all the time." J.B. testified that her ear injury was the result of "a megaphone being blown at me. * * * From two megaphones being blown at me for I don't know how long but it was what felt like forever."

### 4. The Protests in General

{¶ 19} On cross-examination, J.B. was asked if she could identify which statements J.D., as opposed to any of the other protesters, made. J.B. answered, "No. He was involved in them." Asked again if she could remember specific statements that J.D. made, J.B. answered as follows:

> Yes, I do remember him threatening [George]. I do remember them calling us terrorists. I do remember them telling me to come over the fence and that they'll whoop my a**. It was a group of them collectively.
>
> It wasn't just one of them fighting with me, arguing with me, getting in my face. It was multiple. So do I know the rest of their names? No. * * * They were all together screaming at us.

{¶ 20} J.B. testified that she has had no interaction with J.D. or any of the other protesters since July 12, 2020.

{¶ 21} According to J.B., there were police officers at the June 19, 2020, and July 12, 2020 protests, but not at the June 27, 2020 protest. J.B. testified that "as long as it's not [J.D.] and a few others, I don't have any issues with them protesting. They have a right to their opinion." According to J.B., she feels this way because J.D. "has been consistently aggressive."

{¶ 22} Asked who said the comment about "going to whoop you're a**," J.B. answered, "I think the girl said she would whoop my a**." According to J.B., J.D. "said he'll show me like how he's going to enter my personal space because * * * I asked him to please stop hassling the customers."

{¶ 23} J.B. testified that she "thought" J.D. was angry at the protests. J.B., on the other hand, was not angry. "In fact I've ignored them almost every time that they've been there. They haven't made me angry once."

{¶ 24} According to J.B., approximately 10-25 people participated in each protest. J.B. testified that all of the protests at issue were announced in advance, and she was "not unaware" of them prior to them occurring.

{¶ 25} Asked why she filed "this protective order," J.B. testified as follows: "the threatening comments that [O.S.Y. and J.D.] made, not just about me, but also about [George], but then they literally weaponized blow horns on purpose. * * * [T]hey clearly want to do harm to me and most likely [George] as well." J.B. also testified that "I just wanted them to leave me alone. I just wanted to know that they had to leave me alone * * *."

{¶ 26} J.B. first testified that she "authored" the CSPO "alone" and next testified that a "justice system advocate" helped her fill out and file the CSPO. While filing the CSPO, this advocate told J.B. that J.D. had a "violent history," and she was "much more scared * * * that he would retaliate" after finding this out. J.B. and her young son stayed with J.B.'s mother while an alarm system was installed in J.B.'s home. Asked again why she wanted the CSPO, J.B. testified as follows:

> I have zero desire or any interest in living in fear and/or thinking that — like last night I woke up at 4:00 a.m. and I couldn't sleep. I thought somebody was opening the garage door. * * * And I have a two-year old and I also want to be able to go to work and feel good about going to work and not just like constant living in fear of if he's going to follow me out to my car and do something to me.

**B. Joseph Orvec**

{¶ 27} Joseph Orvec ["Orvec"], who testified on behalf of J.B., stated that he works for George, and he was at TownHall on June 19, 2020, "anywhere from 4:00 to 6:00" p.m. because "there was a major alarm with all of us because of the protests that was [sic] scheduled." He went to TownHall to "make sure that people kind of feel at ease, make sure everything goes smooth." Orvec heard J.D. say to George, "You're a f****** p***y, I'm going to kill you." Orvec testified that, based on what he heard J.D. say to George, he believed that J.D. was a threat to J.B.

{¶ 28} The protestors were directing their "words" to J.B., who was one of the few nonprotesters there. Police officers were also there.

**C. Christopher Piazza**

{¶ 29} Christopher Piazza ("Piazza"), who testified on behalf of J.D., stated that he is a founding member of WPWP and he has known J.D. since the beginning

of June 2020. Piazza was present for all the protests at issue in the case at hand. According to Piazza, as part of the protests, he was "yelling" and "attempting to educate individuals who were entering * * * George's establishments" about "George's behaviors and the behaviors in his business, the racism, xenophobia, sexism, transphobia that we've noticed among Mr. George and other people in his establishment." Piazza's role within WPWP was to monitor and inform the protesters if they "were getting off message or anything, * * * pull them off to the side and stop them."

{¶ 30} Piazza testified that he never heard J.D. make any threats against J.B. or anyone else at the protests. He also never saw J.D. do anything at the protests "that would have caused a reasonable person to fear for their safety."

{¶ 31} Piazza testified that he never told J.B. that J.D. had "ever behaved with actual violence toward anyone." Piazza further testified that he

> didn't apologize [to J.B.] for [J.D.'s] behavior. * * * And I was apologizing to her as a victim of Bobby George also having to deal with us being annoying but in no way was I apologizing for the actions of one person. * * * Exactly the same way I would have apologized to any employee that was there that day. * * * I did not know that she was part of the George family at that time and I just thought she was another employee and another victim of Mr. George.

{¶ 32} Asked if he saw J.D. "weaponizing a megaphone to attack * * * J.B. or anyone else at these protests," Piazza answered, "Absolutely not. They got annoying with them sometimes. As I said, that's part of protesting. Never once did it look like a weapon or aggression." Piazza testified that the protesters did not use the megaphone "up in [J.B.'s] ear. They went up to the fence and did it so that the

customers could hear the message or could hear the disruption but I never saw them go right up into her face."

{¶ 33} Asked if J.B. ever told him she feared for her safety, Piazza answered, "No. She went and told multiple police something that day and never once did the police take any actions which led me to believe the police also didn't think that there was any credible threats of violence or aggression."

{¶ 34} Piazza testified about a comment one of the protesters made that was heard on a video of the July 12, 2020 protests that was shown to the court: "We're going to need to find out where [George] lives." According to Piazza, the comment was made so "we can protest outside his house if it gets to that."[1] Piazza was standing with J.D. when J.D. interacted with George. According to Piazza, J.D. "absolutely one hundred percent did not say that" he was going to kill George.

**D. Christopher Martin**

{¶ 35} Christopher Martin ("Martin"), who testified on behalf of J.D., stated that he attended the protests as a neutral observer from the National Lawyers Guild. In this role, he was there to observe the police for "unjust action." He attended all the protests in their entirety, and there was "police presence" at all the protests. Martin did not hear J.D. make any threats to J.B. or "do anything that would have caused a reasonable person to fear for their safety" at any of the protests at issue.

---

[1] It was established during the CSPO hearings that George was not present at TownHall for the July 12, 2020 protest. In this video, the protesters suggested that because George was not present at TownHall, they protest outside of George's house.

**E. George**

{¶ 36} George, who was called to testify by J.D., stated that he was not scared of nor threatened by J.D. because J.D. "only attacks women." However, George also testified that J.D. threatened George's life "several times." George "feared for the safety of [his] employees * * *." George then testified that he feared for his own safety because J.D. said he was going to kill George.

{¶ 37} Asked why J.B. worked outside across from the protesters if George feared for her safety, George answered as follows: "Because my cousin [J.B.] is second in line. She's an important part of our organization, and she has to be around when incidents happen. She had security with her. We had the cops there." Asked if he "had to have [J.B.] sitting right by the door across from the protestors," George answered, "I didn't have to have anything. She chose to be."

**F. J.D.**

{¶ 38} J.D. testified that he executed an affidavit on June 23, 2020, associated with another proceeding, in which he explained why WPWP organized the protests at issue in the case at hand. "A few of those reasons being, one, Mr. George practices unethical business practices, i.e., being transphobic remarks, * * * racial remarks * * *."

{¶ 39} Asked if he has ever "threatened * * * J.B. or done anything that would have reasonably caused her to fear for her safety," J.D. answered, "Never."

**G. Sydney Allen**

{¶ 40} Sydney Allen ("Allen"), who testified on behalf of J.D., stated that she was a protester with WPWP at all the protests at issue in the case at hand. Allen testified that she did not hear J.D. "make any threats to * * * J.B. * * * at any of these protests in a way that would have caused a reasonable person to fear for their safety."

**H. O.S.Y.**

{¶ 41} O.S.Y. testified that she attended the July 12, 2020 protest as part of WPWP. O.S.Y. testified that she did not make any threats that would have caused a reasonable person to fear for their safety. According to O.S.Y., "No threats were made" at this protest.

## III. The Video Evidence

{¶ 42} During J.B.'s cross-examination, two[2] videos of the July 12, 2020 protest at TownHall were played. These videos, which run for 31 minutes and 57 seconds, and 19 minutes and 37 seconds, respectively, were recorded by J.D. on his cell phone. The videos show that protesters were standing across the brick alley from the back entrance to TownHall. For much of the time, J.B. is sitting on a chair or standing at the gated entrance to TownHall's patio, which is located at the back of the restaurant along the brick alley.

{¶ 43} The main focus of the protest early in the videos concerned TownHall employees and patrons not wearing face masks during the Covid-19 pandemic.

---

[2] A third video of the protests was also played at the hearing; however, nothing relevant to the CSPO was shown on that video.

Some of the protesters also commented on George's "sexist hiring practices." The videos depict J.B. and Piazza having a "civil" conversation at the back entrance to TownHall, where J.B. was sitting. After Piazza talked to J.B., he walked back across the brick alley to the protest.

{¶ 44} Audio, recorded on J.D.'s cell phone footage, reveals that the protesters were frustrated that J.B., rather than George himself, was stationed at TownHall's back gate. Off camera, one of the protesters said about George, "We gotta find out where he lives and go to his f****** house." Another protester said, "Find out where he lives."

{¶ 45} The videos show that when J.B. left her station at the back gate of TownHall on a few occasions, J.D. and his cell phone did not follow her. Rather, he continued to protest and record video.

## IV. The CSPO

{¶ 46} Pertinent to this appeal, the CSPO lists J.B. as the petitioner and J.B. and her minor son as the protected persons. J.D. is listed as the respondent. His relationship to the petitioner is listed as "Stalker." The provisions of the CSPO require that J.D. stay at least 500 feet away from the protected persons and forbid him from entering "the residence, school, business, place of employment, day care centers, or child care providers of the protected persons * * *." Further, J.D. "shall * * * not be present within 500 feet * * * of [J.B.] wherever [J.B.] may be found, or any place [J.D.] knows or should know [J.B. is] likely to be * * *." The magistrate's decision ordered that the terms of the CSPO "shall be effective until 07/14/2025."

{¶ 47} The CSPO states as follows:

The Court finds by a preponderance of the evidence that 1) [J.D.] has knowingly engaged in a pattern of conduct that caused [J.B.] to believe that [J.D.] will cause physical harm or cause or has caused mental distress; and 2) the following orders are equitable, fair, and necessary to protect the persons named in this Order from stalking offenses.

## V.   The Trial Court's Journal Entry

{¶ 48} Pertinent to this appeal, the trial court's journal entry finds "numerous statements regarding J.B.'s observations of J.D. that demonstrate why she perceived him to be a physical threat and why his behavior caused her to experience mental distress."  For example, the trial court noted that J.B. "witnessed" J.D. follow George across the street from TownHall to the Family Dollar store.  The trial court also noted J.B.'s testimony that "they" wanted her to come to the fence so "they" could "whoop [her] a**."  Furthermore, the trial court noted J.B.'s testimony that "they said that they know where I live * * *.  We're going to catch you while you're sleeping."

{¶ 49} The trial court also found that the "record is littered with comments insinuating that J.D. was laughing during the testimony of the petitioner and her witnesses and otherwise dismissing their concerns, while minimizing his own criminal and civil litigation history."[3]  While recognizing three incidents where J.D. laughed during the three-day hearing, the record is not "littered" with "comments insinuating" the same.

---

[3] J.D.'s "criminal and civil litigation history" is not relevant to establishing the elements of menacing by stalking.

**{¶ 50}** The trial court found that "J.D. also testified to matters that were directly contradicted by the video evidence played before the court." The trial court did not elaborate upon this finding, and it is unclear what testimony is at issue as the review of the record did not reveal such contradictions.

**{¶ 51}** The trial court noted that the magistrate, who observed the testifying witnesses and weighed their credibility, "finds that * * * J.B.'s testimony was more credible."

**{¶ 52}** The trial court provided the following analysis in issuing the CSPO:

> J.B. testified that she personally witnessed J.D. follow other individuals[4] in an aggressive manner, make aggressive and threatening remarks against J.B.'s physical well-being, and J.B. believed J.D. would follow through on his threats.[5] This threatened danger caused J.B. emotional and mental distress. Because J.B. saw J.D. follow other individuals, she believed his threats when he said he would come to her home. J.D.'s taunting, yelling, and sexually aggressive remarks to J.B. caused her mental distress.

**{¶ 53}** The trial court further found that

> [t]he CSPO will remain effective until July 14, 2025. The CSPO prohibits J.D. from entering the residence, school, business, place of employment, day care centers, or child care providers of J.B., including the buildings, grounds, and parking lots at those locations. It further prohibits J.D. from coming within 500 feet of J.B., or any place that he believes she may be found or where J.D. believes she will be. Finally, the order prohibits J.D. from encouraging any other person from taking any action that he is prohibited from taking.

---

[4] Our review of the record shows that J.B. testified that she saw J.D. follow one individual — George — from TownHall across the street to the Dollar Store.

[5] Our review of the record shows that J.B. did not testify that she "believed J.D. would follow through on his threats."

## VI. Law and Analysis

{¶ 54} On appeal, J.D. assigns one error for our review: "The trial court erred in affirming the magistrate's order granting a [CSPO] against * * * J.D." Within this assignment of error, J.D. presents two issues. First, whether the judgment entry granting the CSPO is supported by competent and credible evidence in the record. Second, "whether the trial court's chilling misapplication of the menacing-by-stalking statute to [J.D.'s] First-Amendment protected protest activity" should be reversed.

### A. Competent and Credible Evidence to Support the CSPO

### 1. Standard of Review

{¶ 55} We review a trial court's issuance of a CSPO under an abuse of discretion standard. *M.J.W. v. T.S.,* 8th Dist. Cuyahoga No. 108014, 2019-Ohio-3573, ¶ 26. A trial court acts within its discretion when ruling on a CSPO if there is "some competent, credible evidence to support" its decision. *Strausser v. White*, 8th Dist. Cuyahoga No. 92091, 2009-Ohio-3597, ¶ 33.

### 2. CSPO R.C. 2903.214

{¶ 56} To issue a CSPO under R.C. 2903.214, a trial court must find, by a preponderance of the evidence, that the respondent engaged in "menacing by stalking" in violation of R.C. 2903.211. *Delaine v. Smith*, 8th Dist. Cuyahoga No. 103860, 2016-Ohio-5250, ¶ 17.

### 3. Menacing by Stalking R.C. 2903.211

{¶ 57} Pursuant to R.C. 2903.211(A)(1), menacing by stalking is defined as follows in part pertinent to this appeal: "No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family * * * member * * * or cause mental distress to the other person or a family * * * member * * *."

{¶ 58} A pattern of conduct means "two or more actions or incidents closely related in time * * *." R.C. 2903.211(D)(1).

{¶ 59} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 60} "[T]o show that a [respondent] violated R.C. 2903.11 and is subject to a civil protection order under R.C. 2903.214, it must be shown that the respondent engaged in conduct that [the respondent] knew would probably cause the complainant to believe that [the respondent] would cause [the complainant] physical harm or cause [the complainant] to suffer mental distress." *Rufener v. Hutson*, 8th Dist. Cuyahoga No. 97635, 2012-Ohio-5061, ¶ 15.

### 4. Analysis

{¶ 61} A review of J.B.'s testimony shows that nothing amounting to J.D. engaging in menacing by stalking J.B. occurred at the June 19, 2020, and June 27, 2020 protests. J.B. testified that her "personal first interaction" with J.D. was at the July 12, 2020 protest. Furthermore, J.B. testified that no threats were made against

her on June 19, 2020, and that nothing of note happened on June 27, 2020, at Barley House and TownHall.

{¶ 62} First, it is noted that on June 19, 2020, J.B. witnessed J.D. following George across the street from TownHall to the Family Dollar store. Nothing in the record suggests that J.D. knew that his conduct of following George would (a) cause J.B. to believe that J.D. will harm her physically, or (b) cause her mental distress. In fact nothing in the record suggests that J.D. knew J.B. witnessed him following George.

{¶ 63} Additionally, J.B. testified that at Harry Buffalo on June 27, 2020, J.D. made comments to her about being "a stupid f****** b****," about how her "p***y smells," and that he "wouldn't f*** her." However, not only did J.B. testify that these comments were nonthreatening, Ohio courts have held that R.C. 2903.211 was "not enacted for the purpose of alleviating uncomfortable situations, but to prevent the type of persistent and threatening harassment that leaves victims in constant fear of physical danger." *Kramer ex rel. Kramer v. Kramer*, 3d Dist. Seneca No. 13-02-03, 2002-Ohio-4383, ¶ 17.

{¶ 64} In *State v. Beckwith*, 8th Dist. Cuyahoga No. 98497, 2013-Ohio-492, this court applied *Kramer* to reverse a defendant's conviction for menacing by stalking. In *Beckwith*, the defendant repeatedly followed a woman around the library where she worked. This occurred "about three times a week," and Beckwith made "grunting noises at her every time she walked by him." *Id.* at ¶ 4. The woman believed Beckwith was recording her with his cell phone camera. *Id.* at ¶ 5.

Ultimately, Beckwith was banned from the library. *Id.* at ¶ 6. Subsequently, Beckwith followed this woman twice in the downtown Cleveland area outside of the library. *Id.*

{¶ 65} This court held that "[w]hile [the defendant's] presence made [the woman] uncomfortable, we cannot conclude from the evidence in the record that he knowingly caused [this woman] mental distress or [the fear of] physical harm as required by R.C. 2903.211(A)(1)." *Id.* at ¶ 17.

{¶ 66} Applying the *Kramer* and *Beckwith* line of analysis, the comments J.D. made to J.B. at Harry Buffalo on June 27, 2020, do not constitute menacing by stalking because they are nothing more than uncomfortable statements.

{¶ 67} Having found that the evidence in the record regarding J.D.'s conduct at the June protests does not amount to menacing by stalking, this author turns to the evidence in the record concerning the July 12, 2020 protest at TownHall.

{¶ 68} J.B. testified that she was present at TownHall on July 12, 2020, "to provide people masks if they needed one, check IDs, and help people get to their seats." Our review of approximately 50 minutes of video footage from that protest shows J.B. doing none of those things, despite many people entering TownHall from that back gate, some of whom were not wearing masks.

{¶ 69} J.B. testified that she was fearful of the protesters, including J.D., particularly because this was the first protest without barricades. According to J.B., the protesters, including J.D., "constantly blew" their blowhorns "within four feet, within three feet" of where she was located. J.B. further testified that the protesters,

including J.D., said they knew where she lived, and they would "catch" her while she was sleeping.

{¶ 70} Asked on cross-examination if she could identify any specific statements that J.D., as distinct from the other protesters, made, J.B. answered, "No." She elaborated that she recalled J.D. threatening George. She attributed all other statements to the protesters in general.

{¶ 71} J.B. testified that the protesters did not make her angry. "In fact I've ignored them almost every time that they've been here."

{¶ 72} J.B. testified that she filed the CSPO because of "the threatening comments that they made," and the weaponization of the blowhorns "clearly" showed that "they" wanted to harm her. She further testified that she "just wanted them to leave me alone."

{¶ 73} Finally, J.B. testified that she became "much more scared" when she learned, at the time she filed the CSPO, about J.D.'s alleged violent criminal history. It is worth noting that nothing in the record supports the assertion that J.D. has a "violent criminal history." In fact, the following colloquy occurred during J.D.'s testimony:

Q: Have you ever been convicted of any crime involving violence?

A: No.

{¶ 74} George testified that J.B. voluntarily positioned herself at TownHall's back entrance during the July 12, 2020 protest.

{¶ 75} It is undisputed that the police were present at the July 12, 2020 protest and did not get involved in the protest or arrest anyone at the protest.[6]

{¶ 76} The video evidence of the July 12, 2020 protest neither necessarily contradicts nor supports J.B.'s testimony. The pertinent videos, which run just over 50 minutes, do not show any interaction between J.D. and J.B., and do not show J.D. making any threats or acting aggressively. This does not mean, of course, that these things did not happen. The videos recorded activity only at TownHall on July 12, 2020, but protests occurred at Harry Buffalo, Barley House, and TownHall on July 12, 2020. No testimony was elicited about whether these videos captured all the protesting activity that occurred at TownHall that day. Nonetheless, the video did not capture any conduct by J.D. that amounted to a violation of the menacing by stalking statute.

{¶ 77} In *Tumblin v. Jackson*, 5th Dist. Coshocton No. 06CA002, 2006-Ohio-3270, ¶ 19, the court found that, although "[o]ne incident is insufficient to establish a 'pattern of conduct'" under R.C. 2903.211, the statute "does not require that a pattern of conduct be proved by events from at least two different days.

---

[6] On January 20, 2021, J.D. and O.S.Y. were charged with felonious assault in relation to J.B.'s alleged injury from the megaphones at the July 12, 2020 protest. The state elected not to proceed on the indictment against J.D., and the court dismissed the case on February 9, 2021. As to the case against O.S.Y., an expert report concluded that "it cannot be said to a reasonable degree of medical certainty that Ms. [J.B.'s] hearing was damaged at the 7.12.20 protest, whether as a result of anyone's megaphone use or otherwise." Based on this report, the court granted the state's motion to dismiss the charges against O.S.Y. on October 28, 2021.

Arguably, a pattern of conduct could arise out of two or more events occurring on the same day, provided that there are sufficient intervals between them."

{¶ 78} In *Tumblin*, the court found insufficient evidence to show a pattern of conduct based on a "one-time incident caused by a heated argument over a misunderstanding regarding the caretaking of Appellant's children." *Id.* at ¶ 25. The Fifth District Court of Appeals stated that "the record does not support, that the Appellant has, on more than one occasion, * * * threatened to cause [Appellee] physical harm or caused Appellee mental distress." *Id.* The *Tumblin* Court reversed the trial court's granting a CSPO against the appellant. *Id.* at ¶ 26.

{¶ 79} In *State v. Erker*, 2019-Ohio-3185, 141 N.E.3d 543, ¶ 74 (8th Dist.), this court held that "two incidents are enough to establish a pattern of conduct for purposes of R.C. 2903.211(A)(1)." In *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 72, the Ohio Supreme Court held that, in relation to proving menacing by stalking, the parties' history "would be relevant to establish both a pattern of conduct and that [the respondent] knew that the [petitioner's] conduct would cause [the petitioner] to believe that [the respondent] was going to harm [the petitioner]."

{¶ 80} Viewing the totality of the evidence, the record does not support that J.D. has, on more than one occasion, knowingly caused J.B. to believe that he will cause her physical harm or caused her mental distress. Taking as true J.B.'s testimony that she heard J.D. say he knew where she lived and he would "catch" her while she was sleeping, this conduct alone does not establish a pattern. The record

is devoid of any evidence that J.D. knowingly engaged in any other conduct that caused J.B. to believe that he would cause her physical harm or that he did cause her mental distress.

{¶ 81} In applying the Ohio Supreme Court's holding in *Spaulding* that the parties' history is relevant to a menacing-by-stalking analysis, it is noted that J.D. and J.B. have no history outside of this case. J.B. works for the restaurant group that J.D. was protesting. J.B. voluntarily worked at the restaurants during all five of the protests at issue in this case. Nothing in the record suggests that J.D. was knowingly targeting J.B. or seeking her out. All of their interactions were in public places during the protests. Mindful that conduct constituting menacing by stalking is not acceptable at protests, nothing in the record suggests that J.D. knowingly engaged in conduct that would cause J.B. to reasonably believe that J.D. would harm her or cause her mental distress.

{¶ 82} In *Krzystan v. Bauer*, 6th Dist. Ottawa No. OT-15-039, 2017-Ohio-858, ¶ 21, the court reversed the trial court's granting a CSPO, concluding that "[t]here are simply no facts to suggest that * * * appellant knowingly caused appellee to believe that he would cause her physical harm." In *Krzystan*, the appellant landlord was in the process of evicting the appellee tenant. *Id.* at ¶ 3, 22. The court held the following:

> Appellant's comment that "you are going to get what you deserve" alleges, at most, an implied or veiled threat. We note, however, that even under a most generous reading of the transcript, there are no other facts, such as physical gestures, body language or tone of voice,

to suggest that appellant intended for his statement to be taken as a physical threat. * * *

The same is true for the alleged "hell to pay" [comment] that appellant allegedly made * * *. There are no facts to suggest what appellant meant by that, other than his stated intention to shut off the water to appellee's unit. In a similar case, where the respondent left a message that he would be "taking action" against the petitioner, but there was no indication of what was meant by "taking action," the Seventh District found that the remark could not support the trial court's decision to issue the CSPO. *Masucci v. Burnbrier*, 7th Dist. Mahoning No. 14MA78, 2015-Ohio-4102, ¶ 17. We find that appellant's alleged comment does not constitute an incident under R.C. 2903.211(D)(1).

*Id.* at ¶ 22-23.

{¶ 83} Upon review, the trial court abused its discretion because there is not competent, credible evidence in the record to support the trial court's issuance of a CSPO against J.D. Specifically, there is no evidence that J.D. engaged in a pattern of conduct sufficient to show, by a preponderance of the evidence, the elements of menacing by stalking.

**B. Menacing by Stalking is Not Protected by the First Amendment**

{¶ 84} Next, this opinion turns to the second issue set forth by J.D. on appeal: "whether the trial court's chilling misapplication of the menacing-by-stalking statute to [J.D.'s] First-Amendment protected protest activity" should be reversed.

{¶ 85} The First Amendment to the United States Constitution provides in part that "Congress shall make no law * * * abridging the freedom of speech, * * * or the right of the people peacefully to assemble, and to petition the Government for a redress of grievances." The United States Supreme Court has "held that a peaceful

march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances." *NAACP v. Claiborne Hardware*, 458 U.S. 886, 909, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), citing *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

{¶ 86} The First Amendment's protections are not absolute. Certain classes of speech, such as "threatening words, obscene speech, fighting words, speech that interferes with the rights of others, speech that creates a clear and present danger, and defamatory speech," are unprotected by the First Amendment. *State v. Plants*, 5th Dist. Tuscarawas No. 2009 AP 10 0054, 2010-Ohio-2930, ¶ 46.

{¶ 87} Nonetheless, Ohio courts have held that R.C. 2903.211 does not chill constitutionally protected speech or conduct. *State v. Smith*, 126 Ohio App.3d 193, 210, 709 N.E.2d 1245 (7th Dist.1998). "Appellant was not prosecuted because he picketed an abortion clinic, he was prosecuted because he engaged in a pattern of conduct which caused the complainant mental distress and caused him to believe that appellant would cause him physical harm." *Id. See also Kreuzer v. Kreuzer*, 144 Ohio App.3d 610, 614, 761 N.E.2d 77 (2d Dist.2001) ("We do not believe it is fairly within the protection of the First Amendment's guarantee of free speech to knowingly cause another to believe one will cause physical harm or mental distress to him or her by engaging in two or more actions or incidents closely related in time." (Emphasis omitted.)).

{¶ 88} Upon review, this author finds that the trial court issued the CSPO against J.D. not because he exercised his First Amendment right to protest, but

because it found that he engaged in a pattern of conduct that caused J.B. to believe J.D. would harm her or caused J.B. mental distress. This conduct is not within the protection of the First Amendment's guarantees.

{¶ 89} Accordingly, J.D.'s sole assignment of error is sustained.

{¶ 90} Judgment reversed.

It is ordered that respondent-appellant recover from petitioner-appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, J., CONCURS IN JUDGMENT ONLY (WITH ATTACHED SEPARATE OPINION);
SEAN C. GALLAGHER, A.J., DISSENTS (WITH ATTACHED SEPARATE OPINION)

MICHELLE J. SHEEHAN, J., CONCURRING IN JUDGMENT ONLY:

{¶ 91} I agree with the lead opinion that the evidence presented does not warrant a CSPO but write separately to offer an alternative analysis of the evidence presented. I recognize that credibility of witnesses is primarily for the trier of facts and we review the trial court's decision regarding CSPO for an abuse of discretion.

The trial court here, however, generalized the petitioner's testimony and drew conclusions without support from the specific testimony provided by her. The trial court also failed to ascertain if the petitioner's testimony established two or more menacing actions or incidents required by the statute. Based on my review, I agree with the lead opinion that the CSPO is not warranted by the evidence presented, but for the following reasons.

{¶ 92} In this case, all the interactions and encounters of the petitioner and respondent occurred in the context of group protests against the establishments in which the petitioner was employed. The testimony reveals the group's animosity towards the owner of the establishments due to his alleged display of racism and sexism, and the group staged various protests in front of these establishment. Even by petitioner J.B.'s own testimony, the conduct of respondent J.D. and his fellow protesters did not seem to target J.B. in particular for the most part.

{¶ 93} R.C. 2903.211 criminalizes "specific conduct directed toward another person when done for an illegitimate purpose." *Bey v. Rasawehr*, 3d Dist. Mercer Nos. 10-18-02 and 10-18-03, 2019-Ohio-57, ¶ 42, *rev'd in part on other grounds, Bey v. Rasawehr*, 161 Ohio St.3d 79, 2020-Ohio-3301, 161 N.E.3d 529. J.B. testified she had her "personal first interaction" with J.D. at the July 12, 2020 protest at TownHall. Even if we ignore her testimony that July 12, 2020, was her first personal interaction with J.D., which appears to be inconsistent with her testimony regarding certain remarks J.D. made to her on June 19 and June 27, J.B. specifically testified no threats were made against her on June 19, 2020; and, regarding the events on

June 27, 2020, when asked if J.D. threatened her personally, she referred to an insulting remark from J.D. but testified that she was not upset by it. As such, the events of June 19 and June 27, testified to by J.B. cannot be the basis of menacing by stalking warranting a CSPO. Consequently, J.B. must prove the events on July 12, 2020 — the final protest — demonstrated a pattern of conduct J.D. engaged in by which he knowingly caused J.B. to believe J.D. will cause her mental distress or physical harm.

{¶ 94} The video depicting the July 12, 2020 protest shows J.B. sat on a stool at the entrance to the patio area of TownHall. She testified she was "fearful" of the protestors because the police failed to provide the barricades, which allowed the protesters to get closer to the establishment. There was no testimony, however, that she was fearful of J.D. in particular in this protest.

{¶ 95} J.B. also testified that the protesters, including J.D., were walking through in front of her and said to her they knew where she lived and "[w]e are going to catch you while you're sleeping. That's how you get them. You catch them while they sleep." On cross-examination, however, when asked if J.D. made specific remarks at her during the protests, J.B. acknowledged the statements were made by "a group of them collectively," stating "they were all together screaming at us." Regarding the July 12, 2020 protest, J.B. also testified the protestors constantly blew their blowhorns as part of their protest activities, which caused injuries to her ears. Again, her testimony did not show J.D. targeted horn-blowing at her.

{¶ 96} Even if we were to construe the testimony as depicting J.D.'s conduct directed at J.B. personally, the testimony did not support the requisite "pattern of conduct." The case law indicates that the statute does not require a pattern of conduct to be proven by events from different days and arguably "a pattern of conduct could arise out of two or more events occurring on the same date, provided that there was a sufficient interval between them." *State v. Scruggs*, 136 Ohio App.3d 631, 634, 737 N.E.2d 574 (2d Dist.2000). Here, however, J.B.'s own testimony reflects J.D.'s conduct (the "catch them" remark and horn blowing) was all part of the protesting activity at TownHall on July 12, 2020. Appellee did not contend there were two separate incidents for the purposes of the statute on this date, and there was no testimony to evince a sufficient interval.

{¶ 97} My review therefore indicates that J.D.'s behaviors, as testified to by J.B., did not reflect a pattern of conduct specifically directed at J.B. and, therefore, there was insufficient evidence to support menacing by stalking as alleged by J.B. In granting the CSPO, the trial court generalized J.B.'s testimony and drew conclusions unsupported by the evidence.

{¶ 98} While the granting of a CSPO is reviewed only for an abuse of discretion, the trial court's findings in support of the CSPO are not borne out by a detailed review of the petitioner's testimony. Therefore, I concur with the lead opinion in reversing the trial court's judgment.

SEAN C. GALLAGHER, A.J., DISSENTING:

{¶ 99} I respectfully dissent and would affirm the judgment of the trial court. The trial court did not abuse its discretion in granting a civil protection order under R.C. 2903.214 in this case. Contrary to the determinations of the other panel judges, the victim in this case met her burden and presented sufficient evidence to demonstrate J.D. committed menacing by stalking as alleged by J.B.

{¶ 100} In overruling the objections to the magistrate's decision, the trial court conducted an independent review, reviewed the testimony provided, examined the evidence presented, and considered the credibility of the witnesses. The trial court engaged in a proper application of the law and determined that "[e]ven when viewing the evidence most strongly in favor of [J.D.], * * * [J.B.] properly *met all requirements* for issuance of a protection order against [J.D.] * * *" and established that J.D. engaged in menacing by stalking. (Emphasis added.)

{¶ 101} A person may seek a protection order under R.C. 2903.214(C) by filing a petition with the court alleging that the respondent engaged in a violation of R.C. 2903.211, menacing by stalking, against the person to be protected by the order. The menacing by stalking statute, R.C. 2903.211, prohibits the offender from engaging "a pattern of conduct" that knowingly causes another person "to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person * * *." R.C. 2903.211(A)(1).[7]

---

[7] "The petitioner has the burden to prove the elements of menacing by stalking by a preponderance of the evidence." *R.G. v. R.M.*, 2017-Ohio-8918, 88 N.E.3d 1027, ¶ 11 (7th Dist.), citing *Felton v. Felton*, 79 Ohio St.3d 34, 41-42, 679 N.E.2d 672 (1997)

{¶ 102} Pursuant to R.C. 2903.211(D)(1), a pattern of conduct is defined to include "two or more actions or incidents closely related in time * * *" or "two or more actions or incidents closely related in time * * * directed at one or more persons employed by or belonging to the same corporation, association, or other organization." R.C. 2903.211(A)(1) provides that in addition to any other basis, "the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs." *Id.*

{¶ 103} In this matter, sufficient evidence was presented to prove J.D. engaged in a pattern of conduct that caused J.B. to believe he would cause her physical harm or caused her mental distress. Briefly, the record reflects that over the course of one month, J.D. took part in a series of protests held at three affiliated restaurants at which two or more actions or incidents occurred. J.B., an employee of the restaurant group, encountered and interacted with J.D. "[t]wo or more times at TownHall, one time at Harry Buffalo and one time at Barley House." J.B. testified that J.D. engaged in threatening and consistently aggressive behavior, which escalated over the course of the protests. At one protest, J.B. witnessed J.D. threatening Robert George, who owns the restaurants, and following him across a street and into a store. Also, J.D. and another protestor said to J.B., "you should

<hr>

(General Assembly intended to apply the usual preponderance of the evidence standard to civil domestic violence protection order where it failed to specify another standard.).

come over this gate and we'll f***ing show you" so "they could whoop my a**." At another protest, J.D. screamed vulgarities and made obscene remarks to J.B. At the last protest, J.B. was fearful when she saw J.D. approach without having any barricades set up. While walking in front of J.B., J.D. and other protesters stated that "we know where you live" and "we're going to catch you while you're sleeping." Additionally, they were constantly using blowhorns within feet of where she was standing, resulting in her later going to the emergency room because of her ears ringing and a migraine. The record further establishes that by engaging in this pattern of conduct, J.D. knowingly caused J.B. to believe that J.D. would cause her physical harm or caused her mental distress. J.B. testified that she was "living in [constant] fear." J.B. began staying at her mother's home while waiting for the installation of a home alarm system in her own home.

{¶ 104} After reviewing evidence from the hearing, quoting portions of J.B.'s testimony, and commenting upon J.D.'s testimony, the trial court determined sufficient evidence was presented to support granting the civil protection order, stating as follows:

> [J.B.] testified that she personally witnessed [J.D.] follow other individuals in an aggressive manner, make aggressive and threatening remarks against [J.B.'s] physical well-being, and [J.B] believed [J.D.] would follow through on his threats. This threatened danger caused [J.B.] emotional and mental distress. Because [J.B.] saw [J.D.] follow other individuals, she believed his threats when he said he would come to her home. [J.D.'s] taunting, yelling, and sexually aggressive remarks to [J.B.] caused her mental distress. Additionally, [J.B.] testified that she experienced hearing loss and headaches—actual physical harm— after being subjected to respondents blowing white noise and an amplified air horn over a long period of time, behavior in which [J.D.]

participated. These threats and abuses took place over three days spanning almost a month. [J.B.] has proved by clear and convincing evidence that [J.D.] caused [J.B.] physical harm, caused her to fear further physical harm, and caused her mental distress.

{¶ 105} Contrary to the lead opinion's view, the record is not devoid of evidence to establish a menacing pattern of conduct. "[I]n determining whether a defendant's conduct constitutes a pattern of conduct, a court must take everything into consideration, 'even if some of the person's actions may not, in isolation, seem particularly threatening.'" *State v. Daylong*, 2021-Ohio-4192, 181 N.E.3d 1245, ¶ 45 (10th Dist.), quoting *State v. Dillard*, 10th Dist. Franklin No. 18AP-178, 2018-Ohio-4842, ¶ 17; *E.J.V. v. S.R.*, 8th Dist. Cuyahoga No. 108615, 2020-Ohio-1612, ¶ 11 (a pattern of conduct was shown by conduct including verbally accosting and intimidating the petitioner, yelling and spitting at petitioner's family members, and other unsettling behavior that caused stress to the family), citing *Guthrie v. Long*, 10th Dist. Franklin No. 04AP-913, 2005-Ohio-1541, ¶ 12; *see also State v. Rowbotham*, 7th Dist. Mahoning No. 19 MA 0066, 2022-Ohio-926, ¶ 49 ("A person of ordinary intelligence could believe that this particular conduct, which was repeated over the course of about a month, would likely cause another person to suffer mental distress.").

{¶ 106} Furthermore, "[e]xplicit threats are not necessary to establish menacing by stalking under R.C. 2903.211." *Harnar v. Becker*, 12th Dist. Warren No. CA2020-10-068, 2021-Ohio-784, ¶ 8 (a pattern of conduct was shown by a respondent's continued presence in former neighborhood and repeated driving past

petitioner's home that increased anxiety), citing *Bartells v. Bertel*, 12th Dist. Butler No. CA2016-11-216, 2018-Ohio-21, ¶ 56. As found in a similar action, "if appellant had just been picketing * * *, his actions would have been protected. However, his conduct crossed the line in that he repeatedly followed the complainant and eventually shouted threatening words at the complainant, all causing him to fear for his physical and mental well-being." *State v. Smith*, 126 Ohio App.3d 193, 210, 709 N.E.2d 1245 (7th Dist.1998). Here, sufficient credible evidence was presented to show J.D. engaged in a pattern of conduct that knowingly caused J.B. to believe he would cause her physical harm or cause her mental distress.

{¶ 107} Finally, I agree with the lead opinion's determination that J.D.'s conduct is not within the protection of the First Amendment's guarantees. "It is not within the protection of the First Amendment's guarantee of free speech to knowingly cause another to believe that one will cause physical harm or mental distress to him such as is contemplated by R.C. 2903.211." *Smith* at 210 (citation omitted) ("Appellant was not prosecuted because he picketed an abortion clinic, he was prosecuted because he engaged in a pattern of conduct which caused the complainant mental distress and caused him to believe appellant would cause him physical harm."); *Coleman v. Razete*, 2019-Ohio-2106, 137 N.E.3d 639, ¶ 25 (1st Dist.) (citations omitted).

{¶ 108} The trial court did not abuse its discretion in granting the civil protection order. Accordingly, I dissent.