J-S05020-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| I.B.N. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| C.H. | : | |
| | : | |
| Appellant | : | No. 333 WDA 2023 |

Appeal from the Order Entered March 8, 2023
In the Court of Common Pleas of Cambria County
Civil Division at No(s):  No. 2022-0174

BEFORE:  PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: APRIL 15, 2024**

Appellant, C.H., appeals from the order entered in the Cambria County Court of Common Pleas, which found Appellant in indirect criminal contempt of court for violating an order under the Protection From Abuse ("PFA") Act,[1] in favor of I.B.N. ("Victim").  We affirm.

The relevant facts and procedural history of this appeal are as follows. Appellant and Victim were married, and they are the parents of a minor child. On January 14, 2022, Victim filed a PFA petition against Appellant.  The petition alleged that Appellant physically abused his child, and he verbally abused Victim when she attempted to intervene on the child's behalf.  The petition also documented other threats Appellant had made against Victim and

---

[1] 23 Pa.C.S.A. §§ 6101-6122.

the child. On January 24, 2022, the court entered an "agreed" order stating that Appellant "shall not abuse, harass, threaten or stalk" Victim, and Appellant "shall have no direct or indirect contact with" Victim. (Order, filed 1/24/22, at ¶1). The order would remain in effect for eighteen (18) months unless the court modified or terminated it.

On October 10, 2022, the Commonwealth filed a criminal complaint alleging that Appellant was in contempt of the PFA order. The complaint stemmed from the following incidents that Victim reported to police: 1) Appellant used his cell phone to record Victim while she was working; 2) someone smashed the windows of the vehicles owned by Victim and her family; and 3) Appellant's adult son from a prior relationship, Matthew Vandergrift, repeatedly drove past Victim while wearing a ski mask and recorded her. (**See** Affidavit of Probable Cause, dated 10/8/22, at 1). As part of their investigation, police interviewed Kylie Kanehl. Ms. Kanehl is the ex-girlfriend of both Appellant and Victim, and she also has a PFA order against Appellant. Significantly, Ms. Kanehl informed police that she had heard Appellant speak with Mr. Vandergrift about vandalizing the vehicles owned by Victim and her relatives.

The court conducted a contempt hearing on February 21, 2023. At that time, the court received testimony from Victim, Ms. Kanehl, Mr. Vandergrift, and police witnesses. At the conclusion of the hearing, the court continued the matter to receive additional testimony. The hearing resumed on March 3,

2023. At that time, Appellant presented testimony from his current girlfriend, Nicole Eash. Ms. Eash claimed to have been present for an earlier conversation between Appellant, Mr. Vandergrift, and Ms. Kanehl. Contrary to Ms. Kanehl's assertions, Ms. Eash claimed that Appellant did not hatch a plot to vandalize Victim's vehicles. Rather, Ms. Eash testified that Ms. Kanehl suggested the acts of vandalism. (**See** N.T. Hearing, 3/3/23, at 6). Appellant also testified and denied asking Mr. Vandergrift to damage Victim's vehicles. (**Id.** at 14).

At the conclusion of the hearing, the court found Appellant guilty of indirect criminal contempt.[2] The court placed Appellant on probation with restrictive conditions for ninety (90) days, and it ordered Appellant to pay a $300.00 fine. Appellant timely filed a petition for reconsideration on March 13, 2023. In it, Appellant challenged the weight and sufficiency of the evidence supporting the contempt conviction. On March 20, 2023, the court denied the petition for reconsideration.

Despite having counsel, Appellant filed a *pro se* notice of appeal on March 17, 2023, while the reconsideration petition was pending. This Court remanded the matter on May 30, 2023. In our remand order, we noted that Appellant was represented by counsel in the trial court, and there was no indication that counsel had withdrawn. Thus, we directed the trial court to

_____

[2] Although the court dictated the contempt order on the record at the end of the hearing, the order was not docketed until March 8, 2023.

clarify the status of counsel's representation. On June 12, 2023, the trial court filed a response indicating: 1) prior counsel no longer represented Appellant; 2) the court had appointed current counsel; and 3) current counsel should file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Current counsel subsequently complied with the court's Rule 1925(b) order.

Appellant now raises one issue for this Court's review:

> Whether the trial court erred in denying Appellant's petition to reconsider/overturn verdict in regards to its finding Appellant guilty of indirect criminal contempt of a PFA order which had been entered against him?

(Appellant's Brief at 5).

"[W]hen reviewing a contempt conviction, much reliance is given to the discretion of the trial judge. Accordingly, we are confined to a determination of whether the facts support the trial court decision." *Commonwealth v. Kolansky*, 800 A.2d 937, 939 (Pa.Super. 2002) (quoting *Williams v. Williams*, 681 A.2d 181, 183 (Pa.Super. 1996), *aff'd*, 554 Pa. 465, 721 A.2d 1072 (1998)). "We will reverse a trial court's determination only when there has been a plain abuse of discretion." *Id.* "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Griffiths*, 15 A.3d 73, 76 (Pa.Super. 2010) (quoting *Commonwealth v. Dent*, 837 A.2d 571, 577 (Pa.Super. 2003), *appeal denied*, 581 Pa. 671, 863 A.2d 1143 (2004)).

- 4 -

On appeal, Appellant contends that the Commonwealth's witnesses failed to link him to the purported actions of Mr. Vandergrift. To the extent that the Commonwealth relied on Ms. Kanehl's testimony to create such a link, Appellant insists that Ms. Kanehl lacked credibility. Although Ms. Kanehl "did testify that there was a conversation Appellant initiated regarding vandalism and getting even with the victim," Appellant emphasizes that each of his witnesses denied that Appellant initiated this conversation. (Appellant's Brief at 11). Appellant insists that "[t]he credible testimony clearly shows that Appellant cut off any conversations by Kylie Kanehl regarding damages, and that he would never do that." (*Id.* at 12). On this record, Appellant concludes that his indirect criminal contempt conviction is against the weight and sufficiency of the evidence. We disagree.

The following principles govern our review of a challenge to the sufficiency of the evidence:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that

the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa.Super. 2019) (quoting *Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa.Super. 2013)).

Additionally,

The weight of the evidence is exclusively for the finder of the fact who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the … verdict if it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Small*, 559 Pa. 423, [435,] 741 A.2d 666, 672-73 (1999). Moreover, where the trial court has ruled on the weight claim below, an appellant court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003), *cert denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (most internal citations omitted).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance

- 6 -

prevention of physical and sexual abuse." ***E.K. v. J.R.A.***, 237 A.3d 509, 519 (Pa.Super. 2020) (quoting ***Buchhalter v. Buchhalter***, 959 A.2d 1260, 1262 (Pa.Super. 2008)).

> Where a PFA order is involved, an [indirect criminal contempt] charge is designed to seek punishment for violation of the protective order. A charge of indirect criminal contempt consists of a claim that a violation of an order or decree of court occurred outside the presence of the court. To establish indirect criminal contempt, the Commonwealth must prove: 1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent.

***Commonwealth v. Lambert***, 147 A.3d 1221, 1226 (Pa.Super. 2016) (internal citations and quotation marks omitted).

Instantly, Victim testified that she had an active PFA order against Appellant. (***See*** N.T. Hearing, 2/21/23, at 5). Despite this order, Victim encountered Appellant in September 2022, while she was completing tasks for her job:

> … I was coming up Bedford Street, and there was an alley right across the street from my mom's house. As we were going up, we seen his car sitting there, and me and my patient … were driving up and he was ready for us. I don't know how he knew, what, it was like he was there just recording us as we went up the street.

(*Id.* at 7).[3]

Victim's patient, Brenda Morris, confirmed Victim's account. (*Id.* at 29-30). Ms. Morris, who had met Appellant on prior occasions, expressly identified Appellant as the individual in the car near Bedford Street. (*Id.* at 31). Ms. Morris explained that Victim's demeanor changed after the sighting, and Victim "was like way out of character." (*Id.* at 30).

Victim also testified that she noticed Mr. Vandergrift following her in September 2022. Initially, Victim observed Mr. Vandergrift driving past Ms. Morris' residence: "I came out and was talking to someone … and [Mr. Vandergrift] drove past with his … video camera just videotaping as he drove past in a ski mask." (*Id.* at 9). Despite the use of a ski mask, Victim knew it was Mr. Vandergrift because she recognized his "blue truck." (*Id.* at 10). On other occasions, Mr. Vandergrift drove past Victim in the same truck, and Victim saw his face without the mask. (*Id.*)

Aside from these encounters with Appellant and Mr. Vandergrift, Victim described the damage to her vehicles. Victim stated that she had used her parents' van and parked it at her residence. The next morning, Victim discovered that two of the windows on the van had been smashed.[4] Then,

---

[3] Victim testified that she worked as a home healthcare aide. (*See* N.T. Hearing, 2/21/23, at 6). As part of her job, Victim transported patients to their medical appointments. (*Id.*)

[4] Victim discovered the damage to the van on September 24, 2022. (*See* Affidavit of Probable Cause at 1).

Victim "woke up the next day, came out," and discovered her own vehicle's "back window and … side window [were] smashed." (*Id.* at 11).

Later at the hearing, Johnstown Police Department Detective Sergeant Cory Adams testified that he reviewed surveillance video from Victim's home as part of the investigation. The surveillance video captured "a blue Ford Explorer Sport Trac," which Victim identified as Mr. Vandergrift's vehicle. (*Id.* at 62). Mr. Vandergrift's vehicle passed Victim's residence multiple times during the early morning hours of September 25, 2022. The surveillance video also captured two individuals approaching Victim's residence on foot at 2:33 a.m., "passing all other vehicles, and they smash the driver's side and rear window of the victim's vehicle." (*Id.* at 63). After smashing the windows, the vandals proceeded to a location "where the blue Explorer Sport Trac was parked." (*Id.* at 63-64). Detective Sergeant Adams noted that one of the vandals "matches the physical description of Mr. Vandergrift. He's a tall, skinny, appears to be young, male." (*Id.* at 65).

Testimony from Ms. Kanehl linked Appellant to the vandalism. Ms. Kanehl testified that Appellant "was just really very angry that [Victim] was able to even get a PFA and that she took his son and he was going to fight the PFA no matter what." (*Id.* at 36). Ms. Kanehl continued:

> There are many things that [Appellant] said about wanting to do to [Victim.] … Talking about breaking out windows, pounding on her windows at her home, scaring [Victim], following her. He did talk about getting back at her stepfather, Bill, for taking her side, her parents taking her side. There was much talk about her getting hurt and then

he would have to take [their son] back.

(*Id.* at 39). Ms. Kanehl indicated that she and Mr. Vandergrift were present for Appellant's conversations about exacting revenge on Victim, and Appellant asked Mr. Vandergrift to slash the tires on Victim's vehicle, break the windows on the vehicle, and harass Victim. (*See id.* at 41-42). Ms. Kanehl notified Victim about these conversations via Facebook messages sent on September 8, 2022. (*Id.* at 44).

The court evaluated this testimony and found Victim and Ms. Kanehl to be credible:

> Reviewing the evidence, this court found that, through circumstantial evidence, that [Appellant] did in fact have indirect contact with the victim. This court, although it did question some of the testimony of Ms. Kanehl, did find her credible in that she heard conversations that [Appellant] was going to cause damage to the victim's property. The court believed that [Appellant] communicated his intent to cause damage to the victim's property, which in fact happened…. This clearly is indirect contact which is prohibited in the agreed order.
>
> The court further found the testimony of the victim credible in that she has seen both [Appellant] and his son videotaping her, with no provocation. This is also uninvited contact that violates the agreed order.
>
> The court recognizes that there is great animosity between the parties, however, the Commonwealth did produce evidence to show that the actions of [Appellant] were in violation of the agreed order.

(Trial Court Opinion, filed 7/17/23, at 6-7) (some capitalization omitted).

Viewing this evidence in the light most favorable to the verdict winner, sufficient evidence supported the contempt conviction. *See Sebolka, supra*.

Despite Appellant's bald assertion that his own witnesses disproved Ms. Kanehl's testimony, the court was free to credit Ms. Kanehl's statements regarding the inculpatory conversation between Appellant and Mr. Vandergrift. **See Champney, supra**. Moreover, the court evaluated Appellant's petition for reconsideration and determined that the verdict was not so contrary to the evidence as to shock one's sense of justice. We cannot say that the court abused its discretion in reaching this conclusion. **Id.** Because the facts support the court's decision, the court did not abuse its discretion by finding Appellant in contempt of the PFA order. **See Kolansky, supra**. Accordingly, no relief is due.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/15/2024